# CHARLESTON

DUDLEY *v.* CHICAGO, MILWAUKEE & ST. PAUL RY. CO.

Submitted January 11, 1906.    Decided January 23, 1906.

1. COMMON CARRIER—*Inspection—Conversion.*

   An inspection of property shipped by a common carrier in sealed cars, unauthorizedly permitted by such carrier, at the point of destination, in consequence of which the consignor who was also the consignee, was prevented from consummating a contemplated sale thereof, does not amount to a wrongful delivery by the common carrier, so as to make it liable for the value of the property, as for a conversion thereof. (p. 607.)

2. COMMON CARRIER—*Perishable Property.*

   If, in such case, the property is perishable and decaying, and the owner, upon being notified of the danger of its loss, relying upon the unauthorized inspection as constituting a conversion, gives

notice of his abandonment of the property and intention to claim the value thereof, the carrier may sell the same on account of the owner, deduct his charges from the proceeds of sale and will be liable for the balance thereof only.  (p. 608.)

3.  Attachment.—*Foreign Corporation.*
    When in a suit against a foreign corporation, in which its property has been attached and afterwards released by the giving of a bond, pursuant to statutory provisions, the defendant appears and makes defense and a personal decree is rendered against it for an amount which it has previously tendered on account of the demand set up in the bill, but not paid into court, it is error to dismiss the attachment and decree a release of the bond.  (p. 609.)

Appeal from Circuit Court, Wood County.

Bill by Lysander Dudley against the Chicago, Milwaukee & St. Paul Railway Company and others.   From the decree, plaintiff appeals.

*Reversed in part.*

V. B. Archer and Wm. Beard, for appellant.

John F. Hutchinson, for appellees.

Poffenbarger, Judge:

Lysander Dudley has appealed from a decree of the circuit court of Wood county, in a suit instituted by him against the Chicago, Milwaukee and St. Paul Railway Company, because it allows him a smaller amount than he claimed, and, although, decreeing the payment of money to him, discharged the attachment and released the bond, given for the forthcoming of the attached property, certain railroad cars, seized at Wheeling and Huntington.

The bill sought a decree for the value of two car loads of apples, shipped by the plaintiff over the Baltimore and Ohio South-western Railway and connecting lines to Elgin, Ill., and consigned to the plaintiff himself, with directions to notify J. W. Sharp, of Chicago, Ill., of the arrival of the cars at their destination.   Expecting Sharp to accept, and pay for, the apples, plaintiff had made drafts upon him for their value, as per contract, attached the bills of lading to them, and discounted them at the First National Bank of Parkersburg, and said bank caused them, in due course of business, to be presented for payment at the office of Sharp.

Upon notice of the arrival of the cars, Sharp's agent was

allowed to inspect the apples, without producing the bills of lading or showing any title or right to the possession of them. Sharp had not then paid the drafts, nor did he afterwards do so. His agent reported that the apples were not such as the plaintiff had agreed to deliver. He immediately notified Dudley, and, presumably the railway company also, for very soon afterwards the agent of the company notified Dudley, by telegraph, of Sharp's refusal, and called upon him to arrange for disposition of the apples, and continued, by subsequent dispatches, from October 24, 1899, until November 3, 1899, to demand that he take care of them. Notice of the intention of the railway company to have them sold was given October 28th. The last telegram, dated November 3rd, notified him that the apples were rotting on the track, and closed with the inquiry, "shall we sell for your account?" To this Dudley replied as follows: "Have made claim against Baltimore & Ohio South-western Railroad for full value of cars; they were wrongfully delivered. If you sell it will be as agent of the Company and for its benefit." After a futile attempt to sell the apples at Elgin, the railroad company shipped them to Chicago, where they were sold for the sum of $397.93, which, after deducting freight charges of $144.84, paid, except, as to its own, by the defendant, upon the guaranty of the B. & O. S. W. Ry. Co., left $253.09, which was tendered to the plaintiff, but refused by him, because he claimed a larger amount.

The theory of his claim, then presented, afterwards asserted by this suit, and now urged here, as one ground of error in the decree, is that the conduct of the defendant railway company, amounted, in law, to a conversion of the apples to its own use. The argument to sustain this position treats the inspection, allowed to Sharp's agent, as an unauthorized delivery of the property to him. That a common carrier is liable for a wrongful delivery, if in any way at fault, is perfectly clear. Such act may be treated as a conversion. Common carriers are bound to exercise the highest degree of care in this respect. "No circumstances of fraud, imposition or mistake will excuse the common carrier from responsibility for a delivery to the wrong person." Hutchinson on Carriers, § 344. To the same general effect, see *Pennsylvania R. R. Co.* v. *Commercial Bank*, 123 U. S. 727, and

*Indianapolis and St. L. R. R. Co.* v. *Herndon*, 81 Ill. 143, cited by counsel for appellant. Of course this general rule, like all others, may be subject to some slight apparent exceptions, which need not be noticed here. But, if there was no delivery, the rule of law relied upon has no application. The property was never out of the possession of the defendant, until sold, or removed for sale, sometime after the inspection. Sharp's agent was simply permitted to enter the cars, set barrels out in his wagon, open them and examine the apples. Then they were put back in the car and it was re-sealed by the agent. It may be true that he had no right to do so, and that the defendant did wrong in permitting the inspection, no evidence of title or right to possession having been shown, but, it is a *non sequitur*, to say, upon these facts, there was a delivery. It may have been an unauthorized act of dominion over the property, but whose act was it? Clearly that of the railroad company, for the property was still in its actual and legal custody. It never parted with its possession. Not every wrongful act on the part of a common carrier, authorizes an action against it as for a conversion. Where goods, intrusted to a common carrier, are injured only, the owners remedy is for damages for the injury, not their value. Hutch. Com. Car. § 770*a*. For delay in delivery, the action must be for damages, resulting, not the value of the property. Hutch. Com. Car. § 328; *Ryland and Rankin* v. *C. & O. Ry. Co.*, 55 W. Va. 181. What is the nature of the plaintiff's injury here? Inspection did not injure the property, so far as disclosed. It prevented the consummation of a sale to Sharp. Can that constitute the basis of an action for the value of the property? That it could not is so obvious that no such claim is made, and this branch of the contention is founded upon the extremely fanciful theory of a technical delivery, for which no authority has been found.

Claim for the value of the property, as for a conversion thereof, is also predicated upon the sale of it. Whether sale could have been made for the charges for carriage, without a judicial proceeding by way of enforcement of the lien, seems not to have been raised. That depends upon whether there is an Illinois statute authorizing such sale. But it is said sale could not be made therefor in this instance because

the B. & O. S. W. Ry. Co. had guaranteed the charges.
But if that agreement was a mere guaranty, and not an abso-
lute undertaking to pay, it was the duty of the defendant
company to collect its charges on the delivery of the prop-
erty. If by due diligence it could not do so, it might fall
back upon the guaranty. However this may be, there was
a clear and undoubted right of sale in the defendant upon
another ground. The property was perishable, and was then
decaying and becoming less valuable every day. The owner
having failed in the effort to make sale of the apples, as he
expected, neglected to take them out of the possession of the
company and take care of them. More than that, his tele-
gram of November 3, 1899, could be construed as nothing
more nor less than a notification that he would treat the ap-
ples as the property of the railroad company, sue for their
value and leave them in the hands of the company. This
he had no right to do, as has been shown. What could the
defendant do under the circumstances? Could it allow the
property to decay? Perhaps it was under no duty to protect
the plaintiff from a loss of his own making. This we do not
decide, but a clear and undoubted right it did have to sell
the property under such circumstances, and, after deducting
its charges, pay the residue of the proceeds to the owner.
It was still the custodian of the plaintiff's property and bound,
as such, to do whatever was necessary to mitigate and pre-
vent, as far as possible, the natural loss, incident to the decay
of fruit, "Where the goods are of a perishable character and
the consignee will not accept them, or there are other reasons
requiring a sale without delay, the carrier may be justified
in selling the goods because of the necessity of the particular
case." Elliott R. R. § 1571.

"But while in the possession of the goods in the character
of carrier, he also stands for many purposes in the relation of
agent for the owner; and it is a general rule of law that,
although the powers of agent are ordinarily limited to the
purposes for which they are employed, yet that emergencies
may arise in which, from the necessities of the case, an
agent may be justified in assuming extraordinary powers;
and that his acts, done fairly and in good faith under such
circumstances, though entirely beyond the scope of his ordi-
nary powers, may be binding upon his principal. Such

emergencies sometimes occur, in the course of the business of the carrier, in which he becomes the agent of all concerned, and in which his acts, in the exercise of a sound discretion, will be binding upon all the parties in interest; and, if the necessities of the case require that the goods be sold, he not only may sell, but it becomes obligatory upon him to do so, for the benefit of the owner. If, for instance, the consignee refuse to accept the goods, and they are of a perishable character, and if stored would, from rapid decay, be totally lost to the owner, it would be the duty of the carrier to sell them on his account; and the same rule would apply if, from any cause, it became impossible to deliver the goods according to the directions of the owner or bailor, or to return them before they would inevitably perish from such inherent tendency, from damage received by them in the transit, or from any other cause." Hutchinson on Carriers, § 432.

If, as to the property so left on its hands, the railway company is to be regarded as a warehouseman, its right to sell the same, to prevent loss by the decay thereof, is equally clear. Any kind of imminent danger of loss or destruction will justify a sale in such case. *Rea's Admx.* v. *Trotter*, 26 Grat. 585; *Jordan* v. *Shireman*, 28 Ind. 136.

The court erred, however, in discharging the attachment and declaring the bond released. Upon what theory this was done is not apparent, unless it was that the defendant had not only submitted itself to a personal decree by appearing and defending, but had also tendered the amount of the decree, except the interest, before suit was brought. No money was paid into court. The effect of a tender, when kept good, only prevents recovery of interest and costs. It does not pay the debt nor extinguish it. The defendant is a foreign corporation, against which the plaintiff had the right to proceed by attachment, for the sole reason that it is such a corporation. The bound taken under the attachment afforded security for the payment of the amount of the decree, either absolutely or to the extent of the value of the property attached. It was a security regularly and properly obtained, so far as this record discloses. That the defendant is amply able to pay several thousand times the amount of the decree, constitutes no reason for releasing the security and sending

the plaintiff to a foreign jurisdiction to procure satisfaction of his personal decree, in case the defendant should see fit to require him to do so.

For this error, so much of the decree appealed from as dismissed the attachment and released the bond must be reversed, annulled and set aside; but in all other respects it will be affirmed, with costs in this Court to the appellant, as the party substantially prevailing.

*Reversed in part.*