# MODEL MILL CO. *v.* CAROLINA, C. & O. RY. CO.*

## (*Knoxville.*   September Term, 1916.)

**1. CARRIERS.   Carriage of goods.   Conversion.**

An initial carrier was not guilty of conversion of goods when it failed to prevent an inspection by the buyer prior to his payment of the draft attached to the bill of lading, on the line of the delivering carrier, even though it resulted in the rejection of the goods and the nonpayment of the draft. (*Post, pp.* 218-220.)

Cases cited and approved: Charles v. Carter, 96 Tenn., 607; Dudley v. Chicago, M. & St. P. R. Co., 58 W. Va., 604; Lyons v. Hill, 46 N. H., 49; Aaron v. Adams Exp. Co., 276 L. J., 183.

**2. CARRIERS.   Shipment of goods.   Contract.   What law governs.**

The law of the place where a contract for the shipment of goods is made must, in the absence of proof of a contrary intention of the parties, be looked to for the creation of obligations imposed by and the interpretation of any rights arising out of it. (*Post, pp.* 218-220.)

**3. SALES.   Sale by sample.   Purchaser's right of inspection.**

A purchaser of goods by sample has the legal right to inspect them on arrival and before payment of the seller's draft attached to a bill of alding and without productiton of the bill of lading, to ascertain whether they correspond to sample, and, if not, to refuse to take them. (*Post, pp.* 218-220.)

**4. SALES.   Sale by sample.   Rejection.   Seller's remedy.**

Where a shipment of goods is, in all respects, such as the shipper, selling by sample, had agreed that it should be, and is rejected by the buyer, without cause, the shipper's remedy is by suit against the buyer for the agreed price. (*Post, pp.* 218-220.)

**5. CARRIERS.   Carriage of goods.   Provision of bill of lading. Storage.**

Under a bill of lading, providing that no carrier should be liable for any loss or damage caused by the act or default of the

---

*The question of liability of common carrier for conversion in permitting unauthorized inspection of freight, see note in 3 L. R. A. (N. S.), 1136.

Model Mill Co. v. Carolina, C. & O. Ry. Co.

shipper, and that property not removed by the party entitled to receive it within forty-eight hours after notice of arrival might be kept in the car, depot, or warehouse at the carrier's responsibility as warehouseman only, or might be stored in a licensed warehouse at the cost and risk of the owner, a licensed warehouseman, to whom the terminal carrier delivered the goods upon performance of the contract of shipment and the buyer's refusal to accept and the shipper's failure to care for them after notice, was the agent of the shipper, through its own default, and not the agent of either carrier. (*Post*, *p.* 220.)

6. **CARRIERS.** Carriage of goods. Storage. Liability.

If the flour after removal to the warehouse was negligently stored or unlawfully sold at the instance of the delivering carrier, the shipper as owner, could look alone to the delivering carrier, and the warehousemen, as the responsible parties, and not to the initial carrier, which had no part in the keeping or disposal of the flour after its delivery to the warehousemen. (*Post*, *pp.* 220-222.)

Cases cited and approved: Milling Co. v. Railroad Co., 91 Kan., 783; Norfolk & W. Ry. Co. v. Stuart Draft Co., 109 Va., 184; L. & N. R. R. Co. v. Brewer, 183 Ala., 172.

7. **CARRIERS.** Carriage of goods. Liability. Shipper's act.

Even where the relationship of common carrier and shipper exists the carrier is not liable, where the loss is caused by the shipper's act, whether that act is one of negligence, misadventure, or misfortune. (*Post*, *p.* 222.)

Case cited and distinguished: Pencil Co. v. Railroad Co., 124 Tenn., 57.

---

FROM WASHINGTON.

---

Appeal from the Chancery Court of Washington County to the Court of Civil Appeals, and by *certiorari* to the Court of Civil Appeals from the Supreme Court—C. J. St. John, Special Chancellor.

Model Mill Co. v. Carolina. C. & O. Ry. Co.

THAD A. Cox and BEN H. TAYLOR, for plaintiff.

T. H. MORRIS, for defendant.

MR. JUSTICE BUCHANAN delivered the opinion of the Court.

The bill sought a decree against the railway company for $850 and interest, and rested on the theory, that the railway company converted to its own use a carload of flour, shipped over its line. It appears that on January 17, 1911, the Model Mill Company, through one of its several agents, made a conditional sale of two hundred barrels of flour to Murphy & Co., of Augusta, Ga. $4.25 per barrel, delivered at Augusta, Ga., was the price agreed on, and it was agreed that the quality of the flour should be equal to that of a sample shown Murphy & Co. by the sales agent of the mill company. Pursuant to this agreement the Mill Company delivered two hundred barrels of flour to the railway company, at Johnson City, on the date aforesaid, and consigned the flour to itself. Incorporated in the bill of lading was an order to the railway company to notify Murphy & Co. on arrival of the shipment at Augusta. The mill company paid all freight charges from the point of origin to the point of destination of the shipment. The railway company issued its bill of lading and delivered the same to the mill company, to which the latter attached its sight draft on Murphy & Co. for $850. These papers it delivered to a bank in John-

son City to be sent to a bank in Augusta for collection of the amount of the draft, and thereupon delivery of the bill of lading to Murphy & Co. The latter document contained, among others, the following clause:

"The surrender of this original order or bill of lading properly indorsed shall be required before delivery of the property. Inspection of property covered by this bill of lading will not be permitted unless provided by law, or unless permission is indorsed on this original bill of lading, or given in writing to the shipper."

The bill of lading also set out the routing of the car to be via the line of the defendant company, and the Charleston & Western Carolina Railway Company, the former being the initial, and the latter the delivering carrier. The bill of lading was signed by the shipper, and the initial carrier. In due course the shipment arrived at Augusta, and Murphy & Co. were notified thereof by the delivering carrier, and there was likewise timely arrival at Augusta of the draft with bill of lading attached, and the Augusta bank tendered the latter to Murphy & Co., and demanded payment of the draft. Whereupon Murphy & Co., while the shipment was still in the car at the depot of the delivering carrier, claimed the right to inspect the flour for the purpose of determining whether or not the quantity, condition, and quality of the flour shipped was the same as that agreed to be purchased. The delivering carrier granted the

right of inspection. Murphy & Co. inspected the flour, and rejected it, and refused to pay the draft, on the ground that the flour shipped was two grades lower than the sample. Of these facts the shipper was given immediate notice by the delivering carrier, and was requested to give further instructions respecting the disposition of the car. The latter the shipper failed to do, and it resulted that the shipment was held in the car by the delivering carrier, from the date of its arrival at Augusta, on January 21, 1911, on which date it was inspected and rejected by Murphy & Co., until February 27, 1911, on which date it was taken from the car and stored in a licensed warehouse in Augusta, pursuant to authority so to deal with it conferred by section 5 of the conditions agreed to by the initial carrier and the shipper in the bill of lading. Said section 5 reads:

"Property not removed by the party entitled to receive it within forty-eight hours (exclusive of legal holidays), after notice of its arrival has been duly sent or given may be kept in car, at depot, or place of delivery of the carrier or warehouse, subject to reasonable charge for storage and the carrier's responsibility as warehouseman only, or it may be, at the option of the carrier, removed to and stored in a public or licensed warehouse at the cost of the owner, and there held at the owner's risk, and without liability on the part of the carrier, and subject to a lien for all freight and other lawful charges including a reasonable charge for storage."

The flour remained stored in the licensed warehouse until August 10, 1911, at which time it was sold by the warehouseman, because it had begun, a few days prior to the sale, to show signs of deterioration in quality. On January 30, 1911, the Model Mill Company wrote the following letter to the initial carrier:

"C. C. & O. Ry. Co. to Model Mill Co., Dr.

"To amount of car of flour C. P. 87064, from Johnson City, January 17, 1911, to order notify Murphy & Co., Augusta, Ga. 336110 lb. Jute sacks..200 Bbls., at $4.25, Bbl. del'd....$850.00.

"This car of flower was opened by Murphy & Co. without surrender of B./L., and rejected on a technicality that the same was not up in grade.

"We know positively, and are willing to make affidavit, that we shipped exactly the grade of flour we sold them, and as the market has declined considerably since this sale was made we maintain that Murphy & Co. were looking for an excuse to reject the flour, and when allowed to open the car before paying our draft, to get possession of the B./L. took advantage of the opportunity.

"We attach herewith copy of original invoice and request that your company take up our draft as soon as returned to our bank, in order obtain B. L. to use in support of this claim. R. R. to Mr. W. A. Starrit, C./A., with request to handle without delay.

"Yours truly,          MODEL MILL Co.,

"J. W. RING, Pres."

No damage was done to the flour during shipment from Johnson City to Augusta, and no damage occurred to it while it remained in the railroad car at Augusta. It remained in that car subject to the mill company's orders for disposition, of which fact the Mill Company had knowledge, from the date of its above letter, January 30, 1911, until February 27, 1911. No damage was done to the flour in removing it from the car to the warehouse. It remained in the warehouse subject to the shipper's order for disposition from February 27, 1911, until sold August 10, 1911. Signs of deterioration did not appear in the flour until two or three days prior to its sale. The flour was sold at $2.75 per barrel, and the net amount realized on the sale was $442.10, which, with interest at six per cent, from date of sale, the defendant company, by its answer to the amended bill, on behalf of the delivering carrier, offered to pay into court, and did pay into court, by certified check payable to the clerk and master, who, in response to an order of reference, reported to the court that said sum had been paid over to the Model Mill Company. The flour had declined in market value about fifteen cents per barrel between the date of shipment and of its arrival in Augusta, but this decline in value was not caused by act of either of the carriers. The special chancellor confirmed the reports of the clerk and master, and decreed that in addition to the net proceeds of the sale already paid to the mill company that it should recover from the initial carrier $260 freight and

$72.80 interest from August 10, 1911, making a total of $332.80 and costs. From this decree the initial carrier prayed and perfected a broad appeal, and the Model Mill Company prayed and perfected an appeal from so much of the decree as denied it a recovery for the sum of $850 and interest. The court of civil appeals reversed the decree of the chancellor and dismissed the suit. The case is before us on the mill company's petition for *certiorari* and assignments of error.

By the first of these it is insisted that the initial carrier was guilty of a conversion of the flour to its own use when it failed to prevent an inspection by Murphy & Co., prior to payment of the draft. It is urged that the inspection enabled Murphy & Co. to "create and invent some objection to the flour in order to reject it, and thereby save itself from loss by reason of the fall in price of fifteen cents on the barrel." This proposition is unsound. By the eighth paragraph of complainant's bill it is averred that the clause of the bill of lading relative to inspection was made in Johnson City, Tenn., and "is subject to the laws of this State, and must be governed by same in its interpretation, and in all and any actions brought for breach of same." We agree that:

"The law of the place where the contract is made must, in the absence of proof of the intention of the parties to the contrary at the time of making the contract, be looked to for the creation of obligations imposed by and the interpretation of any rights aris-

Model Mill Co. v. Carolina, C. & O. Ry. Co.

ing out of it.'' Hutchinson on Carriers, vol. 1 (3d Ed.), section 201.

But it has long been the settled law of this State that a purchaser such as Murphy & Co. is disclosed to have been has the legal right to inspect such a shipment as that here involved before payment of the draft, and without production of the bill of lading. Murphy & Co. had this right of inspection in order to ascertain if the flour was in quality, quantity, and condition such as it had agreed to purchase, and in the event it was not, to reject the flour and refuse to take it. Such was the holding of this court in *Charles* v. *Carter,* 96 Tenn. (12 Pick.), 607, 36 S. W., 396. In that case the shipment involved was a carload of Irish potatoes. It was an order to notify shipment, and went from a shipper at Memphis, Tenn., to a conditional purchaser in Kansas City, Mo. In the present case Murphy & Co. had not, prior to the shipment, seen or accepted it as fulfilling the agreement of the shipper. The latter had, by the means aforesaid, undertaken to protect itself from bad faith on the part of Murphy & Co., and therefore it is but just that the law should accord to Murphy & Co. the right of inspection, to the end that bad faith on the part of the shipper be not successfully practiced. If the shipment was in all respects such as the shipper had agreed it should be, and was without just cause rejected by Murphy & Co., the shipper had its remedy by suit against Murphy & Co. for the agreed price. At all events, however the matter be reasoned

out, it is clear upon authority that where a carrier grants the right of inspection in such a case, his act does not amount to a conversion of the goods, although it may result in a rejection of the goods and subsequent nonpayment of the draft by the drawee. *Dudley* v. *Chicago, M. & St. P. R. Co.*, 58 *W.* Va., 604, 52 S. E., 718, 3 L. R. A. (N. S.), 1135, 112 Am. St. Rep., 102; Hutchinson on Carriers (2d Ed.), sec. 393; *Lyons* v. *Hill*, 46 N. H., 49, 88 Am. Dec., 189; *Aaron* v. *Adams Exp. Co.*, 276 L. J., 183.

The second and only other question made by petitioner is that when the flour was sold by the warehouseman, the price realized was below the market price at the time of the sale, and that the sale was made without compliance with the law governing such sales, and was therefore under the operation of the federal statute and amendments regulating commerce between the States, a conversion of the goods by the initial carrier. This insistence must be rejected. The warehouseman was the agent of the shipper, and not the agent of either of the carriers. When Murphy & Co. rejected the shipment and refused to pay the draft, the shipper became bound under condition 5 of the bill of lading to receive the flour.

It is shown that the shipper had due notice of the arrival of the car at destination. It is clear that the shipper did not, within forty-eight hours, exclusive of legal holidays, after it received such notice, remove the shipment from the car in which it arrived at the point of destination. The shipper was therefore

in default. It failed to discharge its duty with respect to this shipment, under section 5 quoted supra. This failure brings into play against the shipper another one of the conditions of the bill of lading. It is provided in section 1 of those conditions ''that no carrier or party in possession of any of the property herein described shall be liable for any loss or damage thereto caused by . . . the act . . . or default of the shipper or owner.'' Now during all the time that the flour remained in the car at destination after the shipper received notice of its arrival, and of the rejection by Murphy & Co. the shipper was in default under section 5, and when the flour passed from the car into the custody of the licensed warehouse, the latter became the agent of the shipper under section 5, and there was a final termination of the contract of carriage. That contract was discharged by performance, so far as any liability under it by either of the carriers was concerned. If the delivering carrier thereafter intermeddled with the disposition of the shipment by the warehouseman, its act in so doing cannot be connected with the original contract of carriage, for that contract, as above indicated, had already been discharged. If an unlawful sale, or negligent storing, of the flour was made, at the instance of the delivering carrier, by the warehouseman, after the original contract of carriage was discharged, it is clear that the shipper, as owner of the flour, must look alone to the delivering carrier and the warehouseman as the responsible parties; the

initial carrier cannot be held responsible because it had no part or lot in the keeping or disposal of the flour after its delivery to the warehouseman. See *Milling Co. v. Railroad Co.*, 91 Kan., 783, 139 Pac., 397; *Norfolk & W. Ry. Co. v. Stuart Draft Co.*, 109 Va., 184, 63 S. E., 415; *Louisville & N. R. R. Co.* v. *Brewer* (1913), 183 Ala., 172, 62 South, 698; 4 R. C. L., sec. 229.

If the shipper, as the party entitled to receive the flour under section 5 of the bill of lading, had discharged its duty in respect of receiving and caring for the same at the point of destination, it is clear that there would have been no deterioration in the quantity, quality, or condition of the flour, and no sale of same by the warehouseman. We have heretofore held that:

"Even in cases where the relationship of common carrier and shipper does exist, the common carrier is not liable where the loss is caused by the shipper's act, whether that act be one of negligence, or misadventure, or misfortune." *Pencil Co. v. Railroad Co.*, 124 Tenn. (16 Cates), 57, 134 S. W., 613, 32 L. R. A. (N. S.), 323.

The judgment of the court of civil appeals was correct, and is affirmed.