RIVERSIDE MILLS v. ATLANTIC COAST LINE R. CO.

(Circuit Court, S. D. Georgia, N. E. D. January 14, 1909.)

1. CARRIERS (§ 177*) — INTERSTATE COMMERCE — LOSS OF FREIGHT — ACTION AGAINST INITIAL CARRIER—DEFENSE.

In an action by a shipper against an initial carrier for loss of goods shipped in interstate commerce, as authorized by Hepburn Act (Act Cong. June 29, 1906, c. 3591, 34 Stat. 593 [U. S. Comp. St. Supp. 1907, p. 906]) § 7, the carrier may make any proper defense which can be made in a court of law and which any connecting carrier on the line of which the goods were lost or injury occurred might make.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 177.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

2. CARRIERS (§ 23*)—INTERSTATE COMMERCE—LOSS OF GOODS—HEPBURN ACT.

Hepburn Act (Act Cong. June 29, 1906, c. 3591, 34 Stat. 593 [U. S. Comp. St. Supp. 1907, p. 906]) § 7, authorizing an action by the holder of an interstate bill of lading for loss of goods on any part of the transit against the initial carrier is valid.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 23.*]

3. COMMERCE (§ 1*)—DEFINITION.

Commerce is an exchange of goods. The word also includes the subject, vehicle, agent, and various operations by which such exchange is effectuated.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 2; Dec. Dig. § 1.*

For other definitions, see Words and Phrases, vol. 2, pp. 1287–1298; vol. 8, pp. 7606–7607.]

Action for Damages, under "Interstate Commerce Act." Demurrer upon ground of violation of fifth amendment of Constitution, depriving of property without due process of law.

R. J. Southall and Alexander Akerman, for plaintiff.
Joseph Lamar, for defendant.

SPEER, District Judge (orally). So clear are my own convictions about this question, also in view of its immediate importance, that perhaps I should not, for the sake of attempting anything like a neat opinion, delay a decision of the case by taking it under advisement.

For a very long period of our history, Congress, although authorized by the organic law to regulate commerce between the states, failed to take any very valuable or substantial action relating to that great topic. The marvelous development of our interstate and foreign commerce, the multiplication of great railroads, the combinations of these railroads into vast systems, the enormous power which was thus accumulated by the railroads, and the helplessness of the shipper in his conflict with these systems, resulting from such accession of power, pressed upon the minds of the members of the national Legislature. Looking, then, to the letter of the organic law, they found the authority to enact legislation of this general character. The Interstate Commerce Commission was created. Numerous amendments to the original law were made. These were not, however, regarded as sufficient, and this bill, which because of the name of its distinguished author is called the "Hepburn Bill" (Act June 29, 1906, c. 3591, 34 Stat. 584 [U. S. Comp. St. Supp. 1907, p. 892]), was enacted.

Under this provision the action is brought. It is an action in behalf of the Riverside Mills, a corporation of this city, against the Atlantic Coast Line Railroad. The complaint is that the plaintiff shipped a quantity of its product to points beyond the destination of this railroad, and that the goods were not delivered. No payment has been made for them by the consignee, and redress is sought by recourse to an action based upon the provisions of this clause of the "Hepburn Bill" (section 7), which is as follows:

"That any common carrier, railroad or transportation company, receiving property for transportation from a point in one state to a point in another state, shall issue a receipt or bill of lading therefor and shall be liable to the

lawful holder thereof for any loss, damage, or injury to such property caused by it or by any common carrier, railroad or transportation company to which such property may be delivered or over whose line or lines such property may pass, and no contract, receipt, rule or regulation shall exempt such common carrier, railroad or transportation company from the liability hereby imposed."

This is, as I understand it, but the converse proposition of what has long been the law in our own state. If a shipment comes to this state over the lines of connecting railways, and a default or loss is occasioned anywhere by the negligence of one of the railway connections of a line within our state, it may result, if I am not incorrect in my recollection, in an action against the railroad whose terminal is here, and which last received the goods as in good order. Instead of making the last railroad responsible, with equal force and justice, Congress has reversed the process, which the Legislature of Georgia long ago fixed, and which has been recognized as the law within this state since that statute was enacted.

Where is the wrong in it? It is said that the initial carrier is obliged to give a bill of lading in violation of due process of law. Why so? When suit is brought against him, he is entitled to his day in court. He can deny that the bill of lading was given, or that the freight was received. He can make any proper defense, which may be made in a court of law, and which any other connecting carrier might make, wherever the goods are transported, or wherever the loss or injury occurred. If the loss occurred from the act of God or from the country's enemies, for instance, on a section of these intercommunicating lines somewhere between here and the point of destination, or was otherwise capable of defense, this railroad would have the privilege of making such defense here.

By the act of Congress the shipper is afforded an inexpensive and convenient tribunal in which to seek enforcement of his rights. When we consider the great extension of railroad connections, and the thousands of miles of distance which they comprehend, in the absence of this provision, how helpless would be a shipper here if he should attempt to ship his products to the Pacific Coast, and they should be injured, or lost, for instance, on the Oregon Short Line. The railroads have every facility for deriving all the information in regard to the claim. They daily settle and determine thousands of claims between themselves. Where there is a controversy between a single individual and many corporations, with such power and such opportunities, how hopeless is he who is compelled to go to a foreign jurisdiction, when the railroad fare there might more than offset his profits. Congress has acted wisely. It has brought the courts to the door of the shipper. It has bent a listening ear, and heard his complaints. He is afforded the necessary protection of the law, a speedy and cheap trial.

What is the power "to regulate interstate commerce"? Commerce has been defined many times by the Supreme Court. Perhaps the definition by Mr. Justice Johnson in Gibbons v. Ogden, 9 Wheat. 230, 6 L. Ed. 78, is as good as any other. He said:

"Commerce, in its simplest signification, means an exchange of goods; but in the advancement of society, labor, transportation, intelligence, care, and vari-

ous mediums of exchange become commodities, and enter into commerce. The subject, the vehicle, the agent, and the various operations become the objects of commercial regulation."

We have seen that Congress can regulate the vehicle of commerce and the essentials of that vehicle. It can regulate the proof of the passage of possession, the bill of lading, and it requires that the bill of lading shall be delivered by the initial road to the shipper. What could be more obvious than this necessity? The initial carrier receives the goods from the shipper and inspects them. Best of all, it has the opportunity to speak as to their character, and the method of ascertaining their value. It charges freight on the entire transaction. It "gets the business," as is said, that might be sent over any other road. The common carriers have been given great privileges by the public—among others, the right of eminent domain. All the agencies of government are made for its protection. If undue reductions of rates are attempted by state authorities, the carrier at once resorts to the United States courts and obtains relief. That relief is ratified by the Supreme Court of the United States. The carrier is a great agent of society, and in the acceptance of that agency it has received such enormous benefits that it is compelled to submit to those restrictions which society finds it necessary to place around it for the protection of the public generally.

To my mind it is amazing that our government had so long failed to enact this law. I differ toto cœlo with my gifted friend, Judge Lamar, and must overrule the demurrer.