No. 18,675.

## THE HOGAN MILLING COMPANY, *Appellant*, v. THE UNION PACIFIC RAILROAD COMPANY, *Appellee*.

SYLLABUS BY THE COURT.

1. INTERSTATE SHIPMENT—*Goods at Destination—Last Carrier a Warehouseman — Goods Lost by Fire — Initial Carrier Not Liable.* By the act of Congress of June 29, 1906 (Part 1, 34 U. S. Stat. at Large, ch. 3591, pp. 584, 595, U. S. Comp. Stat. 1901, Supp. 1911, pp. 1284, 1307) an initial carrier is not liable as a carrier for an interstate shipment over lines of connecting carriers where the goods were held at their destination by the last carrier as a warehouseman, after the lapse of a reasonable time for their removal subsequent to the mailing of a notice of their arrival and reasonable diligence to find and locate the consignee.

2. SAME—*Initial Carrier Not Liable When Delivering Carrier's Liability Ceases.* It was not the purpose of the Carmack amendment to make the initial carrier liable where the connecting carrier's liability as a carrier has ceased. A carload of flour received by defendant for transportation beyond its line from a point in one state to a point in another state, having duly arrived at the place to which the shipper had by mistake billed the car, and there remained uncalled for five days after notice mailed to the consignee named and after diligent inquiry upon the part of the connecting carrier to find and locate the consignee had failed, the liability of the last carrier as a common carrier had terminated, and it was liable only as a warehouseman.

3. SAME—*Proximate Cause of Loss Was the Fire—Not Negligence of Connecting Carrier.* In the case stated in the preceding paragraph the goods arrived at the destination named in the bill of lading on the morning of April 4. The local agent of the last carrier mailed a postcard notice to the consignee and made inquiries to find the consignee, but was unable to do so. The car and contents were destroyed by fire on April 9 without fault or negligence of the last carrier. On April 5 the shipper discovered the mistake in the billing, and requested an intermediate carrier to divert the shipment to the proper destination. *Held,* that the delay of the intermediate carrier in complying with the request was not the proximate cause of the loss of the goods.

Appeal from Geary district court; ROSWELL L. KING, judge. Opinion filed March 7, 1914. Affirmed.

*H. L. Humphrey,* of Abilene, for the appellant.

*R. W. Blair, C. A. Magaw,* and *T. M. Lillard,* all of Topeka, for the appellee.

The opinion of the court was delivered by

PORTER, J.:. Plaintiff sued the initial carrier to recover the value of a carload of flour destroyed while in the possession of a connecting carrier. The court sustained a demurrer to the evidence, and plaintiff appeals.

On March 18, 1910, the Hogan Milling Company, intending to ship a carload of flour to S. W. Mapes & Company, at Middletown, N. Y., made out a bill of lading and by a mistake of its shipping clerk billed the car to Middletown, Pa. It retained a copy of the bill of lading in its office and mailed the original, together with the invoice, to S. W. Mapes & Company at Middletown, N. Y. They were received by the consignee March 22, 1910. The car was transported by the Union Pacific and its connecting carriers from Junction City to Middletown, Pa., where it arrived at nine o'clock on the morning of April 4, over the Philadelphia & Reading Railroad. The agent of that company on the same day placed it on a sidetrack and mailed a postcard notice to S. W. Mapes & Company, Middletown, Pa. He also made inquiries to discover for whom the car was intended, and on April 6, being unable to find the consignee, sent what is called an "Unclaim" report to the Philadelphia & Reading Railroad Company, stating that the car was unclaimed, and asking what disposition should be made of it.

On April 5, the Hogan Milling Company discovered the error in the billing and telegraphed a request to the agent of the Erie, an intermediate carrier, to divert the car to its proper destination. It appears that the agent of the Erie at Chicago neglected to transmit the

diversion order for several days.  In the meantime the car was standing on a sidetrack at Middletown, Pa., where it remained until April 9, when at four o'clock in the afternoon it was destroyed by fire.  The fire originated about two o'clock in the afternoon in the business section of Middletown, spread to where the car stood, and burned over a considerable area of the city, destroying more than thirty buildings.

The bill of lading, a copy of which is attached to plaintiff's petition, provides that no carrier or party in possession of the property described therein "shall be liable for any loss thereof or damage thereto or delay caused by the act of God, the public enemy, quarantine, the authority of law, or the act or default of the shipper or owner"; further, that "for loss, damage or delay caused by fire occurring after 48 hours (exclusive of legal holidays) after notice of the arrival of the property at destination . . . has been duly sent or given, the carrier's liability shall be that of warehouseman only."

The plaintiff claimed in its petition that billing the car to Middletown, Pa., instead of Middletown, N. Y., was a mutual mistake, but the evidence shows the mistake to be that of the plaintiff alone.  The petition also alleged that on April 5 the Union Pacific, by its local agent at Junction City, orally agreed to correct the error and to divert the car from Middletown, Pa., to Middletown, N. Y.  The answer denied this, and also denied under oath that the local agent had authority to make such a contract.  Mr. Hogan, president of the plaintiff company, frankly stated the facts as follows:

"In talking the matter over with him (Mr. Mills) we came to the conclusion that the best way and the quickest way was to wire Mr. Cook, the agent of the Erie at Kansas City, to divert the car.  I assumed that Mr. Mills would also take it up with his company.  I asked him how the matter could be handled in order to get it to the Erie in the quickest possible time.  He said that

by giving the Erie an order they might possibly catch the car before it got off their line. I went over to our office and I immediately wired Mr. Cook."

It is the main contention of plaintiff that the Erie Railroad Company was negligent in failing to handle the diversion order promptly, and that under the Carmack amendment the initial carrier is liable for this negligence. The answer which the Union Pacific makes to this contention is that the failure of the Erie to divert the car promptly was not the proximate cause of the loss of the flour, and that the undertaking of the defendant, so far as the transportation of the flour was concerned, was at an end, due notice having been given to the consignee of the arrival of the car in accordance with the terms of the bill of lading, and that the flour was held by the Philadelphia and Reading railroad as a warehouseman only.

By the act of congress of June 29, 1906 (§ 7), commonly known as the "Carmack amendment" to the "Hepburn act," a carrier receiving property for transportation from a point in one state to a point in another state must issue a receipt or bill of lading therefor, and is liable to the lawful holder thereof for any loss, damage, or injury to such property, caused by it or by any connecting carrier, with a right of action over against a connecting carrier for a loss occurring on the latter's line, and may not contract against such liability. The effect of the Carmack amendment is to hold the initial carrier engaged in interstate commerce, in receiving property for transportation from a point in one state to a point in another state, as having contracted for through carriage to the point of destination, using lines of connecting carriers as its agent. (*Louisville & Nashville R. R. Co. v. Scott,* 219 U. S. 209, 31 Sup. Ct. Rep. 171.) Before that amendment, the initial carrier might by contract limit his liability to loss occurring on his own line. This entailed hardship upon the shipper, who was frequently unable to obtain evidence showing how

or where the loss occurred.  To relieve the shipper of some of this hardship presumptions and rules of evidence were applied by the courts in fastening responsibility when it was found impossible to show on which of several connecting lines the loss occurred; and *prima facie,* that carrier was held liable in whose possession the goods were found in a damaged condition, although the shipper could maintain an action against any previous carrier whose negligence may have caused the loss.  (Note to *Manufacturing Company v. Railway Company,* 121 N. C. 514, 28 S. E. 474, in 61 Am. St. Rep. 682.)

The purpose of the amendment was to prohibit the initial carrier from stipulating in its contracts that it is only bound to carry the property over its own line and then deliver it to the connecting carrier.  It compels the initial carrier to contract to carry over the whole route, and his common-law liability continues until transportation has ended, regardless of any stipulation or provision in the contract to the contrary. Referring to the hardships imposed upon the shipper previous to the adoption of the amendment, the supreme court of the United States, in the opinion in *Atlantic Coast Line v. Riverside Mills,* 219 U. S. 186, 31 L. R. A., n. s., 7, used this language:

"This burdensome situation of the shipping public in reference to interstate shipments over routes including separate lines of carriers was the matter which Congress undertook to regulate."  (p. 200.)

It was not the purpose of the amendment to extend the carrier's common-law liability, except to provide that, until the transportation ended, the liability of an initial carrier should continue exactly the same as if it owned one line of railway from the point of shipment to the point of destination.  Such is the construction which has been placed upon it by the supreme court of the United States, and by other courts.  See *Adams*

*Express Co. v. Croninger,* 226 U. S. 491, where it was said in the opinion:

"The statutory liability, aside from responsibility for the default of a connecting carrier in the route, is not beyond the liability imposed by the common law as that body of law applicable to carriers has been interpreted by this court as well as many courts of the States. *Greenwald v. Barrett,* 199 N. Y. 170, 175; *Bernard v. Adams Express Co.,* 205 Mass. 254, 259." (p. 511.)

To the same effect see *Parker-Bell Lumber Co. v. Great N. R. Co.,* 69 Wash. 123, 124 Pac. 389, 41 L. R. A., n. s., 1064; *Atlantic Coast Line v. Riverside Mills,* supra, and cases cited in Note, 31 L. R. A., n. s., 7-13. See, also, *Kansas City S. R. Co., v. Carl,* 227 U. S. 639, and *Missouri, K. & T. R. Co. v. Harriman Bros.,* 227 U. S. 657.

In order, therefore, to determine whether the initial carrier is liable in the present case, we have only to determine whether it would have been liable for the loss if it had owned and operated the connecting lines as one railroad. And, since under the Hepburn act the initial carrier may make any defense which was available to any connecting carrier on whose line the loss occurred (*Riverside Mills v. Atlantic Coast Line R. Co.,* 168 Fed. 987), the present case may be said to turn also upon the question whether plaintiff could recover upon the facts against the connecting carrier unless, of course, the plaintiff is correct in the further contention that the failure of the Erie promptly to divert the shipment was the proximate cause of the loss.

At the common law carriers were insurers of freight except for loss occurring from the act of God or a public enemy; and two other exceptions have gradually come to be recognized, viz., where the goods are taken by authority of law, or where the loss is occasioned by the act of the shipper. The loss in this instance occurred by fire. Until the transportation ended by delivery, or what would amount to the same thing as

delivery, the carrier was responsible for such a loss, unless, of course, the fire was occasioned by an act of God or a public enemy; and this without reference to any negligence on the part of the carrier. If, however, the transportation had ended and the carrier held the goods merely as a warehouseman, he was not liable for a loss caused by fire, unless it resulted from some negligence on his part or that of his servants.

The evidence is undisputed as to what took place at Middletown, Pa., where the fire occurred. The car arrived at nine o'clock on the morning of April 4. It was immediately placed on a sidetrack. On that day the agent of the company mailed a postcard notice to the consignee named in the bill of lading, S. W. Mapes and Company, Middletown, Pa. The agent testified that he endeavored to find the owner, and on April 4 mailed a postcard to S. W. Mapes and Company, Middletown, Pa.; that he inquired of two flour and feed dealers, the only ones in the town, stating to them that he had a car of flour for S. W. Mapes and Company, but that he was unable to find any one who knew the consignee; that he then made an "Unclaim" report to his superior officer. S. W. Mapes testified that on March 22, 1910, he received the bill of lading sent him by the plaintiff, and that he made no inquiry either by letter or telegram for the purpose of locating the car. As observed, the bill of lading contains a provision that property not removed by the party entitled to receive it within 48 hours after notice of its arrival had been duly sent or given may be kept in car, depot or place of delivery of the carrier subject to the carrier's responsibility as warehouseman only. Upon the undisputed facts the connecting carrier did all that was required of it by giving the notice and making diligent inquiries for the purpose of locating the consignee. Because there was no firm of that name engaged in the flour business at Middletown, Pa., the agent would not necessarily assume there was a mistake in the bill of

lading; it might have been the intention to ship the flour to a consignee at a town where he was not permanently engaged in business. We think it necessarily follows from the evidence that at the time the loss occurred the goods were held by the connecting carrier as a warehouseman only.

Under the Carmack amendment the initial carrier is only made liable for loss, injury or damage resulting from some default in its common-law duty as a common carrier, or some default of the same kind in a succeeding carrier. It does not make the initial carrier liable as a carrier for a loss or injury to goods occurring while held by the succeeding carrier as warehouseman. *Norfolk & W. R. Co. v. Stuart Draft Co.*, 109 Va. 184, 63 S. E. 415, is a case quite similar except that the consignee, after receipt of notice of the arrival of a car of flour, neglected to remove it for an unreasonable length of time. It was held that the liability of the connecting carrier was that of a warehouseman only and the initial carrier was not liable for the loss.

In *Louisville & N. R. Co. v. Brewer*, (Ala. 1913) 62 South. 698, a case directly in point, it was held that an initial carrier is not liable as a carrier under the Carmack amendment for a loss occurring while the goods were held at their destination by the last carrier as a warehouseman after a reasonable length of time had elapsed subsequent to the mailing of notice of their arrival.

At the common law the extraordinary liability of the carrier ended when the transportation was completed. (*L. L. & G. Rld. Co. v. Maris*, 16 Kan. 333; *U. P. Rly. Co. v. Moyer*, 40 Kan. 184, 19 Pac. 639, 10 Am. St. Rep. 183; *McMillan et al. v. M. S. & N. I. R. R. Co.*, 16 Mich. 79, 93 Am. Dec. 208.) That delivery which will discharge a common carrier may be constructive is well settled. (*Tarbell v. Royal Exchange Shipping Co.*, 110 N. Y. 170, 17 N. E. 721, 6 Am. St. Rep. 350.) For cases

to the same effect involving the Carmack amendment, see *Norfolk & W. R. Co. v. Stuart Draft Co.*, 109 Va. 184, 63 S. E. 415, where it was held that where the destination carrier's liability as a common carrier has terminated, and it holds the goods as a warehouseman, the initial carrier is not liable under the Carmack amendment. To the same effect is *Atchison, T. & S. F. Ry. Co. v. Homewood*, (Okla. 1913) 134 Pac. 856.

The contention that the failure of the Erie promptly to divert the shipment after notice by the plaintiff was the proximate cause of the loss can not be upheld. In the case of *Rodgers v. Railway Co.*, 75 Kan. 222, 88 Pac. 885, a car of corn was delivered by the railway company at Frankfort, Kan., for transportation to Kansas City, Mo. There was delay for an unreasonable length of time. When it finally reached Kansas City it was destroyed by the unprecedented flood of 1903. It was contended that if the company had moved the corn promptly it would have been delivered before the flood occurred. It was held, however, that the delay was not the proximate cause of the damage. The opinion contains an elaborate discussion of the doctrine of proximate cause and cites numerous cases in support of the decision. In order that a delay in transportation can render the carrier responsible for a loss it must be so unreasonable as to amount to a conversion. (*Rodgers v. Railway Co.*, supra; *Henry v. Railway Co.*, 83 Kan. 104, 109 Pac. 1005.)

In the last-cited case the owner, in response to a notice, promptly called at the freight depot, tendered the charges due on the goods and demanded the delivery, but the railway company wrongfully refused the demand. One day thereafter an unprecedented flood occurred which damaged the goods. It was held that the refusal of the demand and the wrongful detention amounted to a conversion of the goods, and the railway company was therefore held responsible for the loss occasioned by the flood. The principle that "no wrong-

doer can be allowed to apportion or qualify his own wrong" was applied to the facts.

In *Kemendo v. Fruit Dispatch Co.,* (Tex. Civ. App. 1910) 131 S. W. 73, the diversion of an interstate shipment by an initial carrier to another carrier than the one stipulated in the bill of lading was held to be an act of negligence which makes the initial carrier liable as though for a conversion of the goods when not delivered or when delivered in a damaged condition. But in the present case there was no conduct or act of the connecting carrier that could be said to constitute a conversion; the connecting carrier acted with diligence and endeavored to locate the consignee and to effect a delivery. The goods were at the wrong place through the act of the plaintiff alone. We think it is very clear that the fire and not the delay in carrying into effect the diversion order was the proximate cause of the loss of the flour.

In *Riverside Mills v. Atlantic Coast Line R. Co.,* 168 Fed. 987, it was held that under the Hepburn act the initial carrier may make any defense which could be made by any connecting carrier on whose line the loss occurred. In *Treleven v. Northern Pacific R. Co.,* 89 Wis. 598, 62 N. W. 536, the defendant was the initial carrier. The case was decided before the Carmack amendment, but it was held that the liability of the defendant as a common carrier, in any possible view of the law, had terminated. The facts were similar to those in the present case. The goods had arrived at the place where the shipper, by mistake, had billed them and there remained uncalled for, and were destroyed by fire in the warehouse of the connecting carrier. It was held that a subsequent undertaking by its agent to have them forwarded to their proper destination was at most a gratuitous agency on his part and would not render the defendant liable for loss, as its liability as a carrier had ended and the destination carrier held them as a warehouseman.

Since the loss was not occasioned by the delay in carrying out the diversion order, it becomes wholly immaterial to inquire whether, as the plaintiff contends, the Erie was the agent of the defendant in endeavoring to divert the shipment or was acting merely for the accommodation of the plaintiff.

It follows therefore that the judgment is affirmed.