ADAMS SEED COMPANY, Appellant, v. CHICAGO GREAT WESTERN RAILROAD COMPANY et al., Appellees.

CARRIERS: Interstate Commerce—Carmack Amendment—Initial Carrier's Liability. An initial carrier is not liable, under the Carmack Amendment to the Interstate Commerce Act, for any default of the delivering carrier occurring after it has ceased to be a *carrier*, and while it is acting as a *warehouseman*. (See Act June 29, 1906, 34 Stat. at L. 595, Part 1, Ch. 3591.)

PRINCIPLE APPLIED: Plaintiff, in 1909, shipped from McIntire, Iowa, to itself at Philadelphia, Pennsylvania, a quantity of wool. The initial carrier delivered the shipment to a connecting carrier, which, in turn, delivered the shipment to a second connecting carrier, which carried the wool to Philadelphia.

There was no loss or delay in the shipment. Plaintiff had no place of business in Philadelphia. When the wool arrived at Philadelphia, the delivering carrier sought to notify plaintiff of the arrival by mailing a postal card notification to plaintiff at "Philadelphia, Pa., General Delivery." Plaintiff never received the card. Several days later, the delivering carrier turned the goods over to a storage company to be held for plaintiff. Some four years later, the wool was sold for the freight and accumulated charges thereon. Later, plaintiff brought action against the *initial* carrier, on the claim that the *delivering* carrier was guilty of a conversion of the wool at Philadelphia.

*Held*, the matter and things of which plaintiff complained were done by the delivering carrier *not as a carrier* but as a *warehouseman*, and the *initial* carrier was not liable.

CARRIERS: Carrier as Warehouseman—Goods Awaiting Delivery.
2  Principle recognized that the liability of a common carrier, *as such*, terminates when the goods have reached their destination and are ready for delivery to the consignee.

CARRIERS: Interstate Commerce—Carmack Amendment—Liability of Connecting Carrier. A *connecting* carrier is, under the
3  Carmack Amendment to the Interstate Commerce Act, only liable for its *own* wrong.

CARRIERS: Carriage of Goods—Unauthorized Diversion of Shipment—Ratification. An unauthorized diversion of a shipment
4  from its proper point of destination is irrevocably ratified by the act of the shipper (a) in making claim to the *delivering* carrier for loss and damage, *less the freight*, and (b) in instituting an action against the initial, connecting and *delivering* carriers for such loss and damage.

PRINCIPLE APPLIED: Plaintiff shipped wool from McIntire, Iowa, to himself at St. Louis. The wool was carried to Des Moines by the initial carrier, and turned over to a connecting carrier, who, in turn, transported the shipment to St. Louis. Without authority from the plaintiff, the wool was reconsigned to plaintiff at Philadelphia, at which point plaintiff had no place of business. A second connecting carrier carried the wool to Philadelphia. At the time of its arrival at Philadelphia, no loss or delay had occurred. Upon its arrival at the latter place, the delivering carrier was unable to locate the plaintiff, and the wool was placed in storage. Later, plaintiff learned that his shipment was in Philadelphia, and thereupon claimed that the *delivering* carrier was guilty of a conversion of the wool, and made claim to such latter carrier for the value

of the wool, *less the freight to Philadelphia.* The wool was later sold for the charges thereon. Plaintiff brought action against the initial, the connecting, and the *delivering* carrier, on the theory that there had been a conversion (a) at Philadelphia, by the *delivering* carrier, and (b) at St. Louis, by the first *connecting* carrier, and that the *initial* carrier was liable for both wrongs.

*Held:* 1. Conceding, arguendo, a conversion at Philadelphia, the initial carrier was not liable therefor, because such conversion was an act done by the delivering carrier *not as carrier* but as warehouseman.

2. Plaintiff would not be heard to say that there had been a conversion at St. Louis, because he had irrevocably ratified the reconsignment to Philadelphia.

*Appeal from Howard District Court.*—A. N. HOBSON, Judge.

## DECEMBER 10, 1917.

ACTION to recover for loss of goods shipped over defendants' roads. The opinion states the facts. Judgment in the court below for the defendants. Plaintiff appeals.— *Affirmed.*

*John McCook,* for appellant.

*Carr, Carr & Evans, Reed & Pergler, M. H. Boutelle, E. A. Church, Miller & Wallingford,* and *Roy E. Curray,* for appellees.

1. CARRIERS: interstate commerce: Carmack Amendment: initial carrier's liability.

GAYNOR, C. J.—This action is brought to recover the vaue of certain wool delivered to the Chicago Great Western Railroad Company for shipment, and claimed to have been lost or destroyed. The plaintiff makes all the companies over whose lines the shipment passed parties defendant, and asks judgment against each and all of them. The defendants are railway companies engaged in interstate commerce. The plaintiff is a copartnership doing business under the name of The Adams Seed Company, at Decorah in this state.

The plaintiff alleges, in the first count of its petition, and in an amendment thereto, that, in the month of May, 1909, it delivered the wool in controversy to the Chicago Great Western Railroad Company at McIntire; that it was shipped from McIntire to the city of Philadelphia by the several defendants named herein, and that it was received by said companies for shipment as aforesaid; that, after its delivery to the Great Western Railroad Company, it was transported by said defendants, each in turn, until it reached its destination at Philadelphia. The allegation of the pleading is that each of said defendants, as common carriers, received said merchandise and took possession thereof for shipment in due course of transportation, and that said shipment was consigned by the plaintiff to itself; that defendants carried said wool to its destination at Philadelphia, but failed to deliver the same to the plaintiff (the consignee), and failed to notify the plaintiff of its arrival at its destination; that the defendants have appropriated the same to themselves, or have retained the same, or have delivered it to some person unauthorized, or have lost or wasted it in some manner unknown to the plaintiff.

Plaintiff further alleges, in an amendment to its petition, that the shipment was delivered as above, and was carried by the Chicago Great Western, the initial carrier, to Des Moines, and there delivered by it to the Wabash Railway Company, and carried by it to some point unknown to the plaintiff, and delivered to the other defendant, the Philadelphia & Reading Railway Company; that the last named company carried the goods to Philadelphia. The plaintiff further alleges that, upon the arrival of the wool in question at Philadelphia, the same was taken possession of by the defendant the Philadelphia & Reading Company and there converted to the use of said company, to the loss and damage of the plaintiff in the sum claimed; that the wool arrived at Philadelphia about June, 1909; that none

of the defendants herein, over whose lines the goods were shipped, notified the plaintiff of the arrival of said goods in Philadelphia.

In the second count of its petition, the plaintiff makes all the allegations of the first count a part of the second count; and alleges that the wool in question was delivered to the Chicago Great Western Company, to be carried by it to St. Louis; that both the Chicago Great Western and the Wabash were initial carriers; that they wholly failed to deliver the wool to the plaintiff at St. Louis or elsewhere, or to notify the plaintiff, so that it could obtain the same; that they negligently and without authority from the plaintiff caused said wool to be reshipped from St. Louis to Philadelphia; that neither of said companies had authority to do so, and had no authority to deliver it to the Philadelphia & Reading Company or to cause the wool to be moved over the lines of said company; that the Philadelphia & Reading Company had no authority from the plaintiff to move said wool, and that plaintiff had no knowledge that it exercised such authority; that all of said companies, defendants, acted jointly, and all were negligent in failing to notify plaintiff of the movements of the wool, and in failing to deliver the same to the plaintiff, and in failing to notify the plaintiff where it was, so that plaintiff could obtain possession.

In the third count, plaintiff makes all the preceding allegations a part of this count, and alleges that none of the defendants had any authority to move the wool from St. Louis to Philadelphia, and that, in moving it, they acted negligently and without authority, and all were negligent in respect to the matters hereinbefore referred to.

In the fourth count of plaintiff's petition, plaintiff alleges that, upon the arrival of the wool in Philadelphia, it was taken possession of by the defendant the Philadelphia & Reading Railway Company, and converted to its own use; that, after the shipment reached St. Louis, the plain-

tiff did not thereafter direct its movements, but that the wool was moved under the direction of the defendants the Chicago Great Western Railroad Company or the Wabash Railroad, or both; that the Philadelphia & Reading Company was especially negligent in failing to advise plaintiff of the arrival of the wool, and in failing to deliver the same to the plaintiff and failing to notify the plaintiff of the arrival of the wool and in failing to give plaintiff an opportunity to get possession of it; that all the defendants had knowledge that plaintiff was the consignee, and of plaintiff's home address.

The defendants filed separate answers.

The Chicago Great Western Railroad Company, answering, admits: That, on or about the 29th day of May, 1909, at the station of McIntire on its line of road, it received a consignment of wool from the plaintiff, consigned to the plaintiff at St. Louis, Missouri; that it carried said wool on its line to the city of Des Moines, and there delivered it to the Wabash Railway Company, its codefendant; that the Wabash Company carried it to St. Louis; that, after it had delivered the wool to the Wabash, this defendant received instructions from the plaintiff, or one of its agents, to reconsign the wool to Philadelphia; that it immediately issued instructions by telegram to the Wabash Company to reconsign the wool to Philadelphia; that said wool was thereupon reconsigned and carried by the Wabash Railway Company and other carriers to Philadelphia; that, immediately upon the arrival of the wool in Philadelphia, there was a notice mailed to the Adams Seed Company, addressed to General Delivery, Philadelphia, Pennsylvania, of the receipt of said goods; and that, after the expiration of four days from the date of the mailing of the notice, the Philadelphia & Reading Company moved and stored said wool in a public licensed warehouse in Philadelphia, where the same remained, without being claimed

by the plaintiff or anyone for it, until October, 1913, when the same was sold by said warehouse company to the account of plaintiff; that, at the time the said Philadelphia & Reading Railway Company delivered the wool to the warehouse, the liability of the railway company as a common carrier had ceased, and it was holding the same as warehouseman, and that, if there was any conversion by the Philadelphia & Reading Company in the delivering of said goods to the warehouse, it was while said company was acting as a warehouseman, and not as a common carrier; that plaintiff, at the time, had no office or agency in Philadelphia, and had not, previous to the arrival of the goods, advised any of the defendants of the manner or means in which it could be notified in said city of the arrival of said wool; that, upon the arrival of said goods in Philadelphia, they were unclaimed by the plaintiff or anyone for it, and for this reason were placed in storage. This defendant further alleges that, on or about September 4, 1912, and before the time the wool was sold by the storage company, the plaintiff made a claim against the Philadelphia & Reading Company on account of the loss of said wool, and subsequently brought suit against that defendant, jointly with the other defendants, alleging joint liability on account of the alleged loss; that, by making said claim and instituting said suit against the Philadelphia & Reading Company, seeking to recover damages on account of the alleged loss at Philadelphia, plaintiff ratified the reconsignment from St. Louis, and by said claim and suit has elected to treat the shipment as one entire shipment from McIntire to Philadelphia, and therefore is estopped from claiming anything against this defendant on account of the alleged wrongful reconsignment; and says that the wool was consigned to the Adams Seed Company at Philadelphia, but no street number was given.

The Wabash Railway Company makes practically the same answer as the other.

The answer of the Philadelphia & Reading Company we need not set out, for the reason that, at the conclusion of all the testimony, the plaintiff dismissed its claim as to the Philadelphia & Reading Company.

Thereupon, on motion of the other defendants, the court directed a verdict for them, and, a verdict being returned in accordance with the direction of the court, plaintiff's petition was dismissed, and plaintiff appeals.

There is practically no dispute in the evidence on any material fact. It will be noted from a reading of the several counts of plaintiff's petition that it seems to base its right to recover upon two separate and distinct grounds: one, as for a conversion by the Philadelphia & Reading Company, at Philadelphia; the other, as for a conversion by the other defendants, at St. Louis.

In the original petition, the plaintiff says that the wool in question was shipped by the several defendants from McIntire to Philadelphia, and that it was received by the defendants for shipment to Philadelphia. The language used is rather obscure, but, considering the original petition in all its fullness, it is apparent that it was the intention of the plaintiff in said petition to charge as for a conversion at Philadelphia, on the theory that the wool was consigned to itself at Philadelphia and received by the Philadelphia & Reading Company on such consignment as a common carrier. Plaintiff 'says that all the defendants are common carriers; that they received and had possession of said wool as common carriers; that it was consigned to the plaintiff; that it was carried to its destination at Philadelphia; that the companies failed to deliver it to the plaintiff as consignee at Philadelphia and failed to notify plaintiff of its receipt at its destination at Philadelphia; and alleges that the conversion took place at Philadelphia and that the con-

version was made by the Philadelphia & Reading Company; and they seek to recover of the Philadelphia & Reading Company as for a conversion at Philadelphia.

In other counts of the petition, the allegation is made that, when the plaintiff placed the goods in charge of the initial carrier, it consigned them to itself at St. Louis; that there was no authority on the part of the initial carrier or the Wabash Company to reconsign it; that, by the reconsignment, there was a conversion at St. Louis, because it was a disposition of the property not authorized by the plaintiff, and in violation of the duty which these defendants owed to the plaintiff.

At the conclusion of the testimony, and after the plaintiff had dismissed its claim against the Philadelphia & Reading Company, the remaining companies moved the court to require the plaintiff to elect upon which state of facts it would rely as for a conversion. There seems to have been no election made, and thereupon, the motion to direct a verdict was sustained.

The record shows that the plaintiffs were called as witnesses in their own behalf, and the substance of their testimony is to the effect that the wool was shipped to the Adams Company, as consignee, at St. Louis, without direction as to whom notice should be given to of its arrival there; that they had no office at St. Louis at the time, and had no one to represent the consignee on the arrival of the goods. One of the plaintiffs testified:

"When I delivered the wool to the agent of the initial carrier, I told him I wanted to sell either at St. Louis or Philadelphia, whichever market was the best. We had no agent at St. Louis or at Philadelphia at the time, and no Philadelphia address; had shipped to Philadelphia before then. We had an arrangement with the Pennsylvania road over which we shipped all our wool to Philadelphia that, as soon as any shipment from us arrived there, it should

be turned over to the C. J. Webb & Company, and our wool was shipped to our own address. I said, nothing to the agent, if I did reconsign the wool, that I wanted it to go over the Pennsylvania. We got notice in March, 1912, I think, from the Reading Railway Company. I gave no orders for its disposition; did not go and look at the wool It was my best judgment not to. I never gave the agent at McIntyre orders to reconsign the wool at Philadelphia."

The other member of the plaintiff firm testified:

"Neither myself nor the Adams Seed Company, following the date of its delivery at McIntire, advised or instructed the agent at McIntire to reconsign the wool."

It appears, however, from correspondence between the Reading people and the plaintiff, which occurred about September, 1912, that the plaintiffs expressed no surprise when they found their goods in the possession of the Reading Company at Philadelphia, but sent the following letter:

"We enclose you herewith our claim * * * for shipment of wool made by us from McIntire, Iowa, May 29, 1909, consigned to our order at St. Louis, Missouri, and subsequently reconsigned to our order at Philadelphia, at which place it arrived June 20, 1909. * * * We base our claim on failure on the part of the delivering carrier to promptly notify us of the inability to deliver shipment, * * * so that disposition could have been made, thus preventing loss to us. We have allowed the freight on shipment, but do not believe that we should pay storage charges, as, if we had been given proper advice at the time, there would have been none. * * * (Signed) Adams Seed Company."

With this letter was enclosed an account against the Philadelphia & Reading Company in favor of the Adams Seed Company for the loss of the wool.

This amount not being paid, the plaintiff brought the action against the Philadelphia & Reading Company, and

joined as defendants the other companies over whose lines the wool had passed, and in its original petition based its right to recover against the Philadelphia & Reading Company and the other carriers on the ground that the wool was received by the Philadelphia & Reading Company as a common carrier, and therefore it had failed to discharge its duty as a common carrier, and out of this the loss arose. In the original petition, the liability of the other companies seems to have been predicated on the thought that they were initial and connecting carriers, and were liable for the loss of the goods at Philadelphia because of their previous relationship to the shipment as carriers. This theory of the case never seems to have been abandoned, although, in subsequent pleadings, there seems to be a claim of a conversion at St. Louis by the other companies than the Philadelphia & Reading Company. But, however that may be, it is apparent through all the pleadings, both the original and the amendment, and in every count, that the plaintiff was seeking to recover of the Philadelphia & Reading Company and the other companies as for a conversion at Philadelphia, and the right to recover on this state of facts was never definitely abandoned by the plaintiff in any of the pleadings filed.

The first question that presents itself for consideration, therefore, is: Was there a reconsignment by the plaintiff of this wool to Philadelphia, such as authorized the companies to transport it to Philadelphia through the ordinary avenues of transportation? If there was, and upon arrival at Philadelphia the wool was lost to the plaintiff through the negligence of the Philadelphia & Reading Company, the question arises: Did the loss occur while it was in the possession of the Philadelphia & Reading Company as a carrier, or was there negligence of the Philadelphia & Reading Company at Philadelphia, as a common carrier of the goods, for which the other defendants would be liable?

It will be noticed that these companies

**2. CARRIERS: carrier as warehouseman: goods awaiting delivery.** are charged with the negligence of the Philadelphia & Reading Company only on the theory that they were initial and connecting carriers in the transportation of these goods. If the goods arrived over these connecting lines in safety, and were delivered in proper condition to the Philadelphia & Reading Company, and the Philadelphia & Reading Company received them as delivering carrier and transported them in safety to Philadelphia and held them there for a reasonable time for delivery to the consignee, after which time its liability ceased as a carrier and it became charged with duties to the consignee as a warehouse only, then no negligence of the Philadelphia & Reading Company, after it had ceased to be a carrier and became warehouseman, could be charged to these other defendants, for the reason that the Philadelphia & Reading Company thereafter ceased to sustain any relationship to the other carriers upon which liability could be predicated for its negligence. If the goods shipped over the lines of these other defendants reached the lines of the Philadelphia & Reading Company in proper condition, and were transported by the Philadelphia & Reading Company to the place of destination in safety, and were there held by the Philadelphia & Reading Company, as carrier, for a reasonable time, for delivery to the consignee, then, while the goods remained in the possession of the Philadelphia & Reading Company as carrier, for any loss that occurred through the negligence of the Philadelphia & Reading Company as carrier the initial carrier would be liable, under the Carmack Amendment. But in no event

**3. CARRIERS: interstate commerce: Carmack Amendment: liability of connecting carrier.** could the connecting carrier, the Wabash, be liable for the negligence of the Philadelphia & Reading Company, even as carrier; for it did no wrong on which liability could be predicated. We are considering this case now on the

theory that there was a through shipment from McIntire to
Philadelphia authorized by the plaintiff; that the Chicago
Great Western was the initial carrier; that the Wabash was
the connecting carrier, and the Philadelphia & Reading
Company the delivering carrier. Under the Carmack
Amendment, the initial carrier is liable for any loss or in-
jury to the goods while in the possession of any of the car-
riers as carriers. The connecting carrier, however, is only
liable for its own wrong. It is fundamental that the in-
itial carrier is only liable for the negligence of the deliv-
ering carrier when the negligence occurs while the deliver-
ing carrier holds possession of the goods as carrier. Even
the initial carrier is not liable for the negligence of the de-
livering carrier after the relationship to the goods as car-
rier has ceased.

In *Hicks v. Wabash R. Co.*, 131 Iowa 295, this court,
speaking upon this question, said, in Division 2 of the
opinion:

"But the defendant was, beyond question, a common
carrier of goods as to plaintiff's trunk from New Conception
to Shenandoah, for it undertook to transport the trunk
for a reasonable compensation to be paid, and the only
question on this branch of the case is whether its liability
as common carrier had terminated and that of warehouse-
man had arisen before the destruction of the trunk by fire
in defendant's station house; for it is conceded that the loss
was one for which the defendant would be liable if it still
held the trunk as common carrier, but would not be liable
if the trunk was in its possession as warehouseman. The
rule which has been consistently adopted by this court
from the beginning is that the liability of the common car-
rier, as such, terminates when the goods have reached their
destination and are ready for delivery to the consignee, and
that thereafter the carrier is warehouseman only, even
though the consignee has received no notice of the arrival of

the goods at their destination and has had no opportunity to take them away (citing authorities). The general weight of authority, no doubt, is that the carrier remains liable as carrier until the consignee has had a reasonable opportunity to take the goods."

It follows, therefore, that, upon the receipt of the goods at Philadelphia by the Philadelphia & Reading Company, this Philadelphia & Reading Company was required to hold the goods for delivery to the consignee for a reasonable time. During that time, the initial carrier, the Chicago Great Western, remained liable for any loss or injury to the goods while so in possession of the Philadelphia & Reading Company as delivering carrier. After a reasonable time, the relationship of the Philadelphia & Reading Company to the goods as common carrier ceased. It thereafter held the goods as warehouseman only, and for any loss or injury to the goods while it remained in the possession of the Philadelphia & Reading Company, the Philadelphia & Reading Company would not be liable as carrier, but only for negligence as warehouseman. Under the Carmack Act, the initial carrier is not liable for the negligence of the delivering carrier after its relationship as carrier has ceased, and its duty to the plaintiff and to the goods becomes that of warehouseman only. Or, in other words, if the transit was at an end, if the delivering carrier had ceased to have possession of the goods as carrier and held them in another capacity, as warehouseman, then the delivering carrier was responsible only for the care and diligence which the law attaches to that relation, and the loss occurring while held in that relation does not reach back and involve the initial carrier or any connecting carrier.

As supporting what we have said, see *Norway Plains Co. v. Boston & M. Co.,* 1 Gray (Mass.) 263 (61 Am. Dec. 423) ; *Gregg v. Illinois Cent. R. Co.,* (Ill.) 35 N. E. 343; and

*Kight v. Wrightsville & T. R. Co.,* (Ga.) 56 S. E. 363, in which it is held:

"When goods which have been received by a railroad company for transportation to a given station on its line of road and delivery there to the consignee of the same reach their destination and are there deposited by the company in its freight warehouse for safe-keeping until delivered to such consignee, the general rule is that the responsibility of the company as a common carrier ceases, and its liability as a warehouseman begins."

See also *Hogan Milling Co. v. Union Pac. R. Co.,* (Kans.) 139 Pac. 397. In this case it is held that it was not the purpose of the Carmack Amendment to make the initial carrier liable where the connecting carrier's liability as a carrier has ceased, and it was said:

"It was not the purpose of the amendment to extend the carriers' common law liability, except to provide that, until the transportation ended, the liability of an initial carrier should continue exactly the same as if it owned one line of railway from the point of shipment to the point of destination."

It was further said:

"The initial carrier, under the Carmack Amendment, is only made liable for loss, injury or damage resulting from some default in its common law duty as a common carrier, or some default of the same kind in a succeeding carrier. It does not make the initial carrier liable as a carrier for a loss or injury to goods occurring while held by the succeeding carrier as warehouseman."

In *Norfolk & W. R. Co. v. Stuart's Draft Milling Co.,* 63 S. E. 415, the Supreme Court of Virginia said that, if goods are not received by the consignee within a reasonable time after their arrival, the railroad company's liability as a common carrier ceases, and its liability thereafter is only as a warehouseman.

It was further held that, where a connecting car-
rier's liability as carrier for an interstate shipment had
terminated, the initial carrier would not be liable for the
value of the goods under the Carmack Amendment, for
the reason that the liability of the initial carrier attaches
only while the goods remain in its possession, or in the
possession of its connecting carriers as such. See also
*Model Mill Co. v. Carolina, C. & O. R. Co.,* (Tenn.) 188 S.
W. 936.

It appears that, when this wool reached Philadelphia,
over the Philadelphia & Reading line, the Philadelphia &
Reading line sent notice to the consignee, addressed to it
at Philadelphia, in care of general delivery; that it there-
after held the goods for. a reasonable time, and then de-
posited them in a public warehouse for the use and bene-
fit of the consignee; that the goods were never called for by
the consignee; and that, in 1912, notice was sent to the
consignor at Decorah of the fact that the goods were in
storage, and that they would be sold for charges if the
charges were not paid; that neither the consignee nor the
consignor, the same person, made any claim to the goods,
but preferred a bill against the Philadelphia & Reading
Company for the value of the goods. A letter accompany-
ing the bill and a statement of the account are hereinbefore
set out.

It is apparent, then, that whatever loss occurred to
the plaintiff by any act of the Philadelphia & Reading Com-
pany occurred after the Philadelphia & Reading Company
had ceased to be a carrier and had become a warehouseman,
and cannot be charged to preceding carriers. It follows,
therefore, that no liability for any negligence of the Phil-
adelphia & Reading Company, as warehouseman, could
reach back and affect the initial carrier, the Chicago Great
Western Railroad Company, under the Carmack Amend-
ment. The Wabash Company could not, in any event, be

liable, because it did no wrong to the plaintiff or the goods, and was not the initial carrier, so as to be affected by the Carmack Amendment. So it is apparent that, for anything that happened in Philadelphia, after the Philadelphia & Reading Company had ceased to be carriers of the goods, these defendants now involved could not be made liable.

4. CARRIERS: carriage of goods: unauthorized diversion of shipment: ratification.

It is contended, however, on this hearing that, inasmuch as the plaintiff consigned to itself at St. Louis the goods delivered to the initial carrier, and the Chicago Great Western, the initial carrier, delivered the goods to the Wabash to be transported to St. Louis only, the goods should have been delivered to the plaintiff at St. Louis; and that the reconsignment of the goods without authority from the plaintiff was a violation of the duty that these companies owed to the plaintiff, and effected a conversion of the goods at St. Louis for which both these companies are liable—the Wabash for having reconsigned them to Philadelphia, and the Great Western for having directed the consignment to Philadelphia.

The liability of these defendants on this theory cannot be considered, for the reason that whatever was done in the way of reconsigning these goods to the plaintiff at Philadelphia, after they reached St. Louis, was ratified by the plaintiff with full knowledge of all the facts upon which they now predicate the liability of these defendants. To hold the defendants as for a conversion at St. Louis is wholly inconsistent with the claim of a conversion at Philadelphia. In asserting a conversion at Philadelphia by the Philadelphia & Reading Company, the plaintiff affirms its ownership and right to possession of the goods at Philadelphia, and negatives a previous conversion of the same by these other defendants at St. Louis. It amounts to a waiver of any conversion at St. Louis, ratifies the act of those companies in transporting the goods to Philadelphia,

and seeks to hold the Philadelphia & Reading Company liable as for a conversion there on the theory that it was the delivering carrier of the goods in the process of transportation to Philadelphia. When it filed with the Philadelphia & Reading Company its claim hereinbefore set out, and offered to allow for freight on transportation, and sought to hold all companies as common carriers of the goods to Philadelphia, it ratified the act of the other companies in reconsigning the goods to Philadelphia, and waived its claim for damages as for a conversion at St. Louis.

There is some difficulty in understanding the plaintiff's theory or theories in this case. One theory seems to be that there was a conversion at Philadelphia by the Philadelphia & Reading Company as common carriers, for which the initial carrier, the Great Western, is liable under the Carmack Amendment. Even on this theory, the Wabash could not be liable, as connecting carrier. The second theory is that the shipment was made originally, and so far as authorized by the plaintiff, over the Great Western and the Wabash to St. Louis; that neither of these companies had any authority to reconsign or transport the goods beyond that point; that, when they did attempt to so do, their act was, in effect, a conversion of the property by both of these companies at St. Louis, for which each is liable. If the case stopped there, there might be some basis for holding these companies liable; but when the plaintiff proceeds further, and by its conduct ratifies the reconsignment of these goods from St. Louis to Philadelphia, the situation is the same as if originally the plaintiff had consigned the goods to itself at Philadelphia. If it ratified the reconsignment, all these companies became common carriers of the goods to Philadelphia, and the initial carrier, the Great Western, but not the connecting carrier, the Wabash, would be liable as for a conversion at Philadelphia, provided the conversion took place while the property was

held by the Philadelphia & Reading Company as common carrier; but in no event could the initial carrier be held for a conversion by the Philadelphia & Reading Company after its relation to the property as carrier ceased. If the act of these companies in reconsigning it is ratified by the plaintiff, the rights of the parties are the same as if originally authorized. It cannot ratify and repudiate at the same time. After ratification, the liabilities of the parties to each other must necessarily be the same as if the act ratified was originally authorized.

As sustaining the claim of these defendants that the plaintiff ratified the reconsignment to Philadelphia in bringing suit against the Philadelphia & Reading Railway Company as delivering carriers, and basing the liability of the Chicago Great Western on the allegation that it was initial carrier, and therefore liable for the acts of the Philadelphia & Reading Company as delivering carrier, see *Converse v. Boston & M. R. Co.*, 58 N. H. 521. In that case the plaintiffs contracted to furnish slate to one C. for a schoolhouse which C. was then erecting, to be "cash on delivery." The slate was ordered directed to themselves at F. Plaintiffs found the goods at the schoolhouse and workmen engaged in putting it on. C. was not there. They sued C. Soon after, C. called on the plaintiffs and gave them an order on the school district. The order was not accepted or paid. The plaintiffs were never paid. They commenced an action against C., afterwards dismissed the action, and brought an action against the railroad company as for a conversion. The court said:

"If the delivery was authorized, the plaintiffs have no claim against the defendants. If the delivery was unauthorized, and they subsequently ratified it, the ratification is equivalent to an authorized delivery, and is an effectual bar to the plaintiffs' recovery."

See also *Burritt Co. v. New York Cent. & H. R. R. Co.*,

135 N. Y. Supp. 557, There, a carrier received freight consigned by straight bill of lading to a consignee, and delivered the freight to a third person, pursuant to an unauthorized order. Before the delivery, the consignee had contracted to sell the freight to the third person, and when he learned of the delivery, he sent the third person an invoice dated before the delivery. Subsequently, and with knowledge of all the facts, the consignee paid the carrier the freight charges, and filed a mechanics' lien against the third person, and a claim for the value of the freight against him in the bankruptcy court. *Held* that the consignee ratified the unauthorized delivery, and could not maintain an action against the railroad company for the unauthorized delivery on the theory of conversion. See *Theusen v. Bryan*, 113 Iowa 496; *Renne v. Townsend*, 124 Iowa 332; *Kuhnes v. Cahill*, 128 Iowa 594.

So it follows that, the plaintiff having ratified the reconsignment to Philadelphia, and these companies having transported the wool over their lines to Philadelphia, without the occurrence of any negligence during transportation, and the goods having been received at Philadelphia over the Philadelphia & Reading lines in good condition, so far as this record shows, and the Philadelphia & Reading Company having held it a reasonable time as common carriers, and having given notice to the consignee at the place of destination, and the plaintiff having failed to call for said goods within a reasonable time, and the Philadelphia & Reading Company having stored the same for the use and benefit of the plaintiff, and the liability of the Philadelphia & Reading Company as carriers having ceased, no liability attaches to these defendants for any acts of the Philadelphia & Reading Company after said goods had passed out of its hands as carrier, and while it held the same, if it did so, as warehouseman.

We find no ground for reversing the action of the court. The cause is, therefore,—*Affirmed.*

WEAVER, PRESTON and STEVENS, JJ., concur.