No. 28,832.

THE MANGELSDORF SEED COMPANY, *Appellant*, v. THE MISSOURI PACIFIC RAILROAD COMPANY, *Appellee*.

(280 Pac. 896.)

Opinion filed October 5, 1929.

*A. L. Roberts*, of St. Joseph, Mo., for the appellant.

*B. P. Waggener, O. P. May, J. M. Challiss* and *W. P. Waggener,* all of Atchison, for the appellee.

The opinion of the court was delivered by

HARVEY, J.: This is an action by a wholesale seed house against the railroad company for damages to two carloads of unthrashed blue-grass seed destroyed or damaged by fire while on defendant's track near plaintiff's warehouse, the fire having originated in the warehouse from unknown causes. The trial court rendered judgment for defendant, and plaintiff has appealed.

The action was submitted to the court below on an agreed statement of facts, the material portions of which may be summarized as follows: Plaintiff is a corporation engaged in the wholesale seed business at Atchison. Its elevator and warehouse were constructed

and maintained on lots or right of way of the defendant railroad company under a lease which contained, among others, the following provisions:

"In consideration of the premises, said lessee shall occupy said leased property at the lessee's own risk entirely, and shall assume, and hereby does assume, all risk of damage by fire, water or otherwise, arising from the maintenance or operation of said lessor's railway, over and upon, or near said property, whether such fire be caused by sparks from locomotives of said lessor, or in any other manner, while this lease is in force, and said lessee shall indemnify and save harmless the said lessor, from all loss, damages, charges, expenses and costs of every kind and nature, arising or that may arise from the death of or injury to any and all person or persons, upon, or going to or from, said property, or to the live stock, teams, or vehicles, belonging to or operated by said lessee, or other persons aforesaid, caused by said lessor or its employees, while operating locomotives or cars upon or adjacent to the leased property, and from injury to any and all buildings and other improvements erected or to be erected upon the land hereby leased, and from injury to any and all personal property in and upon said leased property, whether said loss, damages, expenses or costs shall arise out of the operation of said railroad or any branches, spurs, sidetracks or additions thereto, now or hereafter constructed, or shall arise out of fire set by engines or cars of said lessor, or from any other causes whatsoever, and the said lessee does hereby remise, release and forever discharge the lessor of and from all actions and causes of action at law or in equity arising or that may arise out of the matters and things aforesaid."

Approximately ten feet to the rear and south of the premises leased from defendant by plaintiff the defendant maintained and operated a switch track which, at one time prior to the fire of September 14, 1922, served several industries, but at the time of such fire served only the plaintiff as an unloading track to the elevator and warehouse of plaintiff constructed on the leased premises. This switch track, and the land upon which it was constructed, was not under lease to plaintiff, but was the property of, and operated by, and under the control of the defendant. On or about September 8, 1922, plaintiff purchased from one Craig of Cawood, Mo., a quantity of unthrashed blue grass seed f. o. b. Cawood, Mo., which on that date Craig loaded into two cars for shipment to plaintiff. A shipper's order bill of lading was issued at that point by the Chicago, Great Western Railroad Company covering both cars, which bills of lading were duly executed, and the cars were billed to the order of Craig with directions to notify plaintiff at Atchison. Under these bills of lading the defendant, through its agents and connections (The Chicago, Great Western Railroad Company and

the A. T. & S. F. Railway Company), contracted and became bound to deliver the blue-grass seed to the consignee in as good condition as received from the consignor, unless excused by provisions of contract or law covering existing facts. Both cars moved over the lines of the Chicago, Great Western Railroad Company from Cawood, Mo., to St. Joseph, Mo., thence over the A. T. & S. F. railway to Atchison, where they arrived on September 11, and at 2:45 p. m. on that day the agent of the A. T. & S. F. Railway Company notified the consignee, and plaintiff paid the freight charges. On September 12 plaintiff ordered the agent of the A. T. & S. F. Railway Company to switch both cars to the defendant for delivery to plaintiff at its elevator and warehouse. Both cars were transferred from the A. T. & S. F. railway to the defendant's line, in the customary manner and at the customary place for making such transfers, some time September 12, and both cars were switched by the defendant and were placed at the usual unloading place on the switch track serving the elevator and warehouse of the plaintiff at 10:30 a. m. on September 13, all of which was known to plaintiff. About 5 a. m. on September 14 fire originating in the elevator and warehouse of plaintiff completely destroyed the elevator. At the time of the fire, and while the elevator was burning, the cars stood at the unloading track of the elevator, where they had been placed at 10 a. m. the previous day. As a result of the fire 334 bags of blue-grass seed were destroyed by fire. Plaintiff had paid $1,335.17 for the seed and $50 for the bags, and 216 bushels of blue-grass seed were damaged by water, creating an additional loss of $162. Freight charges in the sum of $97.26 had been paid by plaintiff on the two cars to the local freight agent of the Atchison, Topeka & Santa Fe Railway Company at Atchison. This payment of freight included freight or switching charges due defendant, being the published and lawful rate on file with the Interstate Commerce Commission. It was the habit and custom of plaintiff to unload all cars placed on the switch track at its elevator and warehouse for unloading on the day same were received, and it was customary for plaintiff to break the seals on cars consigned to it and placed at its elevator and warehouse on the switch track without special permission, or any agent of defendant being present, but neither of the cars was unloaded at the time of the fire. At the time of the fire it was the established rule lawfully on file with the Interstate Commerce Commission, and compulsory with all common carriers, to grant forty-eight hours'

(two days) free time for unloading all commodities after car had been placed for delivery; that on cars delivered on other than public delivery tracks the free time is computed from the first 7 a. m. after actual or constructive placement on such track; that actual placement is determined by the precise time the engine cuts loose; that any railroad track or portion thereof assigned by a railroad company for individual use will be treated "as other than public delivery track."

Defendant argues that the covenants of the lease hereinbefore set out relieve it from liability. This is not an action to recover the value of the warehouse or elevator, or its contents, destroyed by fire caused by the railway company, nor for damages for personal injury to the agents or employees of plaintiff. Consideration of the provisions of the lease discloses its covenants do not specifically cover a release from liability for the loss and damages sought to be recovered in this action. When a carrier attempts to limit its common-law liability it should do so by language so clear that it cannot be misunderstood. (*Heuman v. Powers Co.*, 226 N. Y. 205.) More than that, interstate carriers are not permitted to relieve themselves from liability as carriers by a stipulation in an independent contract such as the lease of an elevator or warehouse having no connection with the contract of shipment of the goods. (*Grain Co. v. Railroad*, 182 Mo. App. 339.) To permit this to be done would tend to violate section 2 of the transportation act, 49 U. S. C. A. § 2. The following cases, while not directly in point, have some bearing on this question: *United States v. Union Stockyard*, 226 U. S. 286; *Lumber Co. v. Railroad*, 270 Mo. 629; *Fourche R. R. Co. v. Bryant Lumber Co.*, 230 U. S. 316; *Central of Georgia Ry. Co. v. Blount et al.*, 238 Fed. 292; *State Line & S. R. R. Co. v. Lehigh V. R. R. Co.*, 277 Pa. St. 227.

For a similar reason the fact that it was the custom of plaintiff to unload a car on the same day it was set on the track near its elevator for unloading has no bearing on the liability of defendant. It has been held that evidence of custom is inadmissible to impose a limitation on the carrier's liability. (*United Artists Corp. v. Puget S. E. R.*, 122 Wash. 537.)

It is plaintiff's contention that defendant's liability as a carrier continued through the forty-eight-hour period of free unloading time provided for in the bill of lading and referred to in the agreed statement of facts, and that since the loss occurred within that

time plaintiff should recover in this case. This ·common-law lia-
bility of carriers has been many times stated by text writers and
in the opinions of the court. Perhaps the statement in *Milling Co.
v. Railroad Co.*, 91 Kan. 783, 139 Pac. 397, is a clear statement
of it so far as the case before us is concerned. It was there said:

"At the common law carriers were insurers of freight except for loss oc-
curring from the act of God or a public enemy; and two other exceptions
have gradually come to be recognized, viz., where the goods are taken by au-
thority of law, or where the loss is occasioned by the act of the shipper."
(p. 788.)

That this was the liability of the carrier while the goods were
being transported is not questioned. The real question is how
long that liability continued, if at all, after the shipment had ar-
rived at its destination. The question appears first to have arisen
in this state in *L. L. & G. Rld. Co. v. Maris*, 16 Kan. 333. It was
there held that the extraordinary liability of a railroad company as
a carrier of goods extends not merely to the termination of the
actual transit of the goods to the place of destination, but also until
the consignee has a reasonable time thereafter to inspect the goods
and remove them in the usual hours of business and in the ordinary
course of business, and that after the expiration of such reasonable
time the carrier is responsible not as a carrier, but only as a ware-
houseman and for ordinary negligence. In that case the then con-
flicting views of the courts on the question were referred to, the
authorities cited, and the merits of the rules discussed. In *Mo. Pac.
Rly. Co. v. Grocery Co.*, 55 Kan. 525, 40 Pac. 899, the rule declared
in the Maris case was reaffirmed and held to apply to the facts in
the case. That was an action for the value of two carloads of sugar
destroyed by fire. The sugar had been originally shipped from New
Orleans to the plaintiff at Wichita and transported over the Texas
& Pacific railroad to Paris, Tex., thence over the Frisco to Wichita,
where it was placed on a wye and switched by the Missouri Pacific
to a spur track, owned and under its control, to plaintiff's warehouse.
The freight had been paid by plaintiff to the Frisco and included
two dollars a car which the Frisco paid to the Missouri Pacific.
The spur track was one that had been constructed by the Missouri
Pacific for use in shipping carloads of merchandise to and from the
warehouse of the plaintiff, and in fact served only that company.
It was the practice, after cars were placed on this track, for the
grocery company to break the seals, open and unload the cars

without further notice to the railway company, or any of its agents or employees being present. The railway company placed the cars on this track at the usual place for unloading by plaintiff on a Sunday afternoon. Sometime on Monday morning the store building of the grocery company burned, and the two carloads of sugar were burned. It is not claimed that the railway company was in any way responsible for this fire, or negligent concerning the same. The court held there had not been a reasonable time for unloading, and that the railway company was liable. These cases were referred to approvingly in *Ward v. Railway Co.*, 87 Kan. 824, 826, 126 Pac. 1083.

Since the early decisions of this court above referred to, federal legislation (U. S. C. A. 49) has been enacted by which the rights of the parties in interstate shipments are governed. (*Milling Co. v. Railroad Co.*, supra.) Under this legislation and the rules of the Interstate Commerce Commission the bill of lading contains a provision, among others, as follows:

"Property not removed by the party entitled to receive it, within forty-eight hours exclusive of legal holidays, after notice of its arrival has been duly sent or given, may be kept in car, depot, or place of delivery of the carrier subject to a reasonable charge for storage and to carrier's responsibility as warehouseman only . . ."

Since these provisions have become controlling, in no case to which our attention has been called has this court passed upon the nature of the carrier's liability within the forty-eight-hour period after notice of the arrival of the goods at destination has been duly sent or given. It will serve no purpose to refer to decisions of other state courts, since they are neither in accord nor are they controlling. (See Dec. Dig., Carriers, Key No. 114, 140.) In *Milling Co. v. Railroad Co.*, supra, the goods had been shipped as directed by the bill of lading (although there had been an error in that) and reached their destination on April 4, and on that day notice to the consignee named in the bill of lading was duly sent. The fire which destroyed the shipment was on April 9. It was said:

"As observed, the bill of lading contains a provision that property not removed by the party entitled to receive it within forty-eight hours after notice of its arrival had been duly sent or given may be kept in car, depot or place of delivery of the carrier subject to the carrier's responsibility as warehouseman only." (p. 789.)

And it was held that, since the forty-eight hours had elapsed after

the notice was sent, the liability of the carrier was that of a ware-houseman only.

The question of the nature of the carrier's liability during the forty-eight-hour period has, however, been directly passed upon by the supreme court of the United States in *Mich. Cent. R. R. Co. v. Mark Owen & Co.*, 256 U. S. 427. That action arose in the municipal court of Chicago for damages for loss on several shipments of grapes. We quote quite liberally from the opinion:

"It is stipulated that the cars were transported by the railroad company from their respective points of origin to Chicago, arriving there at different days and times of day. Upon the arrival of each car it was placed on a public delivery track of the railroad company and notice thereof given. Respondent accepted each car, breaking the seals thereof. And it is stipulated that, at the time respondent started to unload, each of the cars contained the number of baskets and pounds of grapes received for transportation. The loss, whatever there was, occurred after the acceptance of the cars and after their unloading had commenced, and whether the railroad company is liable therefor, and in what capacity liable—whether as carrier or warehouseman, or at all—is the question in the case.

"The answer depends upon the construction to be given to the first paragraph of section 5 of the bill of lading [which is then quoted].

"Regarding the words of the section merely, they are clear enough, and present no 'double sense.' But controversies have arisen and judicial judgments have divided upon them. The point of the controversies has been, and is, as to the relation of the carrier to a shipment within forty-eight hours after notice of its arrival has been duly sent or given, and the contentions upon the point are in sharp antagonism. That of respondent is that the railroad company during the forty-eight hours is responsible as a carrier, this relation not terminating until the expiration of that time. The contention of the railroad company is *contra,* and that it is liable neither as carrier nor as warehouseman—not as carrier because the shipment had been delivered and accepted—not as warehouseman because no negligence has been proved against it. The supreme court decided against the contentions of the railroad company and held it liable for loss on all of the shipments. As to three of them we may say immediately, in disposition of them, respondent withdraws any claim on account of them and confines the issue to one car which was undoubtedly unloaded within forty-eight hours of the notice of its arrival. There is question of the other cars.

"The importance of the issue, however, still remains, although it is concerned with only thirty-one baskets of grapes of the value of $8.68, and the difficulty of its determination is indicated by the fact of the diversity of judicial reasoning upon a like issue in other cases. And counsel have been at pains to set the cases in opposition with approving or disapproving comment of their own.

"The differences of the cases cannot be reconciled and a review of them for the purpose of selection would manifestly extend this opinion to a great

length. Their outside principle is simple enough; the bill of lading is a contract between the transportation company and him who is interested in the shipment, and legal when within the policy and edicts of the law regulating that relation.

"By recurring to section 5 of the bill of lading, it will be seen that it supposes a contingency and provides for its occurrence. It supposes that property may not be removed when it has reached destination, and is available for delivery, and two periods of time are provided for. One of forty-eight hours after notice of the arrival of the property has been sent or given. During this time there is no declaration of the relation of the railroad company to the property. The other period commences at the expiration of the first or forty-eight-hour period, during which the provision is that the property is subject 'to carrier's responsibility as warehouseman only.' The comparison has its significance and must be accounted for. Realizing this the railroad company makes a distinction. Its contention is that where delivery has been made of the property, as it insists was true in the case at bar, the responsibility of the railroad company as carrier immediately ceases. If, however, it is neither delivered nor removed within forty-eight hours after notice of its arrival, the responsibility of the railroad company thereafter is that of 'warehouseman only.'

"To the distinction and the contention based upon it the supreme court of the state answered that the bill of lading provides for property 'not removed'—not to property 'delivered' or 'not delivered,' and it must be taken at its word.

"The answer puts too much emphasis upon the distinction between property removed and property delivered. The property here was not delivered; access was only given to it that it might be removed, and forty-eight hours were given for the purpose. Pending that time it was within the custody of the railroad company, the company having the same relation to it that the company acquired by its receipt and had during its transportation.

"The bill of lading is definite, as we have pointed out, in its provisions and of the time at which responsibility of the company shall be that of warehouseman, and by necessary implication, therefore, until that responsibility attaches, that of carrier exists."

There was a dissenting opinion which pointed out the far-reaching effect of the decision of the court and some hardships that might arise by reason thereof, which shows that these matters had the attention of the court.

We regard this decision of the supreme court of the United States to be controlling as to the nature of the liability of the carrier during the forty-eight-hour free unloading time. This same conclusion was reached by the supreme court of West Virginia in the case of *Del Signore v. Payne*, 89 W. Va. 275, where it was held:

"Section 5 of the conditions contained in such uniform bill of lading, properly construed, gives the owner forty-eight hours after notice by the carrier of the arrival of the goods, within which to remove the goods before the lia-

bility of the carrier as such ceases and its liability as warehouseman begins." (Syl. ¶ 2.)

That is also the view taken by the court of appeals of Ohio in the case of *L. & N. Rd. Co. v. Riley*, reported in 27 Ohio App. 188.

The judgment of the court below is reversed, with directions to enter judgment for plaintiff for the sum agreed upon as plaintiff's loss in the agreed statement of facts.

DAWSON, J., dissenting.