No. 37,566

ANDERSON CATTLE COMPANY, INC., and KENNETH KLINE, *Appellants* v. THE ATCHISON, TOPEKA & SANTA FE RAILWAY COMPANY, and THE CHICAGO, ROCK ISLAND AND PACIFIC RAILROAD COMPANY, *Appellees.*

(206 P. 2d 124)

Opinion filed May 7, 1949.

*Russ B. Anderson,* of McPherson, argued the cause, and *Archie T. Mac-Donald,* also of McPherson, was with him on the briefs for the appellants.

*Mark L. Bennett,* of Topeka, argued the cause, and *Clayton M. Davis,* of Topeka, and *James L. Galle,* of McPherson, were with him on the briefs for appellee Chicago, Rock Island and Pacific Railroad Company; *C. J. Putt, W. E. Treadway, Henry Schulteis,* all of Topeka, and *Rodney Rhoades,* of Mc-Pherson, were on the briefs for appellee Atchison, Topeka and Santa Fe Railway Company.

The opinion of the court was delivered by

ARN, J.: This is an appeal from the ruling of the district court of McPherson county sustaining a demurrer to plaintiffs' evidence in an action to recover for damage to a shipment of cattle by reason of its delay in transit. Evidence showed that plaintiffs ordered eighteen railroad cars for the purpose of shipping eighteen carloads of cattle from Plains, Kan., to Emporia, Kan. The eighteen cars were set in at Plains on December 31, 1946, ready for loading. Plaintiffs loaded ten cars which department for Emporia on December 31. Plaintiffs thereupon arranged with the Rock Island Railroad Company (one of defendants) to use the other eight cars to ship eight carloads of cattle from Plains to Scott City and plaintiff prepared a bill of lading for these eight cars to Scott City instead of Emporia. The bill for the eight cars showed the route to be: Rock Island-Hutchinson-A. T. & S. F. These eight carloads of cattle were loaded and departed from Plains at about one o'clock on the morning of January 2, 1947, en route for Scott City, and arrived at Bucklin, Kan. (58.3 miles northeast of Plains), at about five o'clock on the morning of January 2. These eight loads comprised 233 head of steers, and they remained at Bucklin from 5 a. m., January 2 until 10 a. m., January 6, at which time the Rock Island Railroad Company sent them to Dodge City, a distance of 26½ miles northeast of Bucklin, where they arrived at 2:20 p. m. At Dodge City, these eight cars were turned over to the Santa Fe which transported them to Scott City, a distance of eighty-three miles, where they arrived at 8:00 or 8:30 p. m. the evening of January 6. Sometime the next morning, January 7, the Santa Fe spotted these eight cars at the chutes for unloading. The evidence in its most favorable light to the plaintiffs showed these additional facts: The facilities at Bucklin where the steers were kept for some

four days and five hours were not proper for the caring, feeding and watering of livestock; that although the weather was bad at the time, Rock Island trains were continuing east from Bucklin to Hutchinson where transfer could have been made to the Santa Fe without such delay; that the Santa Fe trains were running every day between January 1 and January 7 although at times they may have been some late. One of the plaintiffs, Kline, as agent for the other plaintiff, Anderson Cattle Co., signed a contract on December 31 for the shipment of the eight carloads of steers (233 head) from Plains to Scott City, and of the ten carloads from Plains to Emporia. On December 31, the cattle were in good average stocker and feeder condition. Plaintiffs did not direct the Rock Island agent as to how the cattle should be routed to Scott City; the railroad made its own routing. Plaintiff Kline did not see the cattle after December 31 until the morning of January 7 in Scott City while they were being unloaded between 9 o'clock and 10 o'clock a. m. They were pretty well shrunken. He weighed a few of the cattle after they were unloaded, and they weighed approximately 700 pounds. In his opinion they weighed about 800 pounds when loaded at Plains. After the cattle were unloaded, they were taken about three or four miles northwest of Scott City, where they remained sixty-five days, without being mixed with any other cattle. When they were unloaded there were no cripples and no visible appearance of damage other than shrinkage in weight and a general tired appearance. During the sixty-five days they did not respond to the feed as such cattle normally should. He (Kline) saw them frequently during the sixty-five-day period. They were handled properly and suffered no mishap or injury during the sixty-five-day period. Cattle abused excessively do not respond as well as normal shipments. Normally it would take probably a week or ten days to get over the shipping. In this instance it would take at least thirty days. The cost of feeding the cattle for the sixty-five days was $21 and some cents per head. During the sixty-five days the cattle did not at any time become restored to the condition they would have been in had they arrived on January 2 or 3. Plaintiffs did not learn of the delay at Bucklin and did not accompany the shipment of cattle from Plains to Scott City. There is a normal shrinkage when cattle are shipped and these cattle would normally have shrunk five or six percent—sometimes moves up as high as ten or twelve percent. Plaintiff Kline was not no-

tified that the cattle had arrived at Scott City; he just happened to be going there on January 7 to see how they were getting along. The cost of feeding the cattle did not increase because of their condition on arrival at Scott City, but their condition on arrival did cause the cattle not to respond to feed and therefore to weigh less than they would have weighed except for the excessive shrinkage and hard handling. Mr. Anderson, president of plaintiff Anderson Cattle Co., saw these cattle in the middle of December and they were in good thrifty condition and gaining weight. The next time he saw them was in Scott City in the middle of January and they did not appear to be doing well although they were kept in extraordinarily well-equipped surroundings. They should have responded to feed and gained weight. They were still not gaining weight the middle of February and were not in as good condition as they were at Plains, Kan., in the middle of December. In Scott City they were being well taken care of and getting all the silage they could eat. Anderson had shipped cattle by rail for about forty-eight years. Ordinarily in a shipment from Plains to Scott City, a distance of approximately 160 miles, cattle would not suffer permanent damage. They would suffer a day or two setback before getting back to normal. Some cattle will be permanently injured and some less, depending on the vitality of the animal when he goes through that kind of punishment. The only way you can tell the extent of it is to go ahead and take care of the cattle and see what the results are. It cost $5,056.21 to feed the cattle for sixty-five days, and then the cattle had been restored only to the same place they would have been had they been transported and arrived at Scott City on January 2 or 3. The cattle weighed about 850 pounds full weight per head the middle of December, 1946; they had weighed 818⅔ pounds per head on October 30, 1946. After being fed at the Parkinson ranch in Scott City for sixty-five days, they weighed 819 pounds. In his opinion the cattle could not be properly fed at the Bucklin stockyards. He was never informed as to the whereabouts or condition of the cattle by the Rock Island or Santa Fe from January 1 to January 7. They never asked for instructions as to how to feed or care for the cattle. He first learned of the delay in transit after they had arrived in Scott City. He filed his claim with the Santa Fe for a delay in shipping the cattle on January 27, 1947. Another witness, Burke, in the cattle business since 1911 and experienced in handling Mexican cattle, saw

these cattle in the middle of December and they were in good condition, thriving and gaining weight. He later saw them at Scott City the middle of January, and they looked "awfully hard"; they looked like they had been abused and did not appear to be thriving and gaining although they had a wonderful home with plenty of food in feed boxes on the south side of windbreaks. Under normal conditions they should have gained weight.

Appellants (plaintiffs) contend that the defendants' demurrer to the evidence was not sufficient to challenge the sufficiency of plaintiffs' evidence as to the establishment of any amount of damages. However, the demurrer was upon the ground that plaintiffs' evidence was insufficient to support a cause of action in favor of the plaintiffs and against the defendants, and if plaintiffs' evidence had failed to prove any damage, the demurrer was broad enough to reach that objection.

From our examination of the abstracted evidence of plaintiffs, we believe the jury did have sufficient facts before it to determine the amount of damage without entering into speculation and conjecture. Appellees argue that plaintiffs' evidence does not show the effect of the negligent delay upon plaintiffs' cattle, but all of the evidence summarized above indicates otherwise. In this respect the plaintiffs' evidence met the test of a demurrer and was a proper question for jury determination.

It is not argued by the appellee railroads that plaintiffs' evidence as to their alleged negligence in handling and delaying the transportation of the cattle shipment by requiring in excess of five days to make a 160-mile trip (or approximately 380 miles if routed through Hutchinson) was insufficient to withstand a demurrer— and, in any event, the record before us indicates plaintiffs' evidence was sufficient in this respect to make that question also one for the jury.

The final question, and probably the principal bone of contention in this lawsuit, is the question of whether the notice of claim provision (sec. 4[c] of the shipping contract) precludes plaintiffs from recovery since it is admitted that plaintiffs did not make any written claim for damage to their cattle until January 27, 1947. The shipping contract, including said section 4(c) thereof, became a part of plaintiffs' evidence when introduced as defendants' Exhibit 1 upon cross-examination of the plaintiff Kline. It is an instrument composed of six sections with numerous subsections

and is entitled "Uniform Livestock Contract." Upon its face it designates the Anderson Cattle Co. as both shipper and consignee. Other notations show shipping station—Plains, Kan., and route— R. I.-Hutch.-A. T. S. F. The instrument is signed by plaintiffs and by the Rock Island Railroad Co., per its agent, R. O. Sansing.

Section 4(c) of this contract provides:

"Before the livestock is removed from the possession of the carrier or mingled with other livestock the shipper, owner, consignee or agent thereof shall inform in writing the delivering carrier of any visible or manifest injury to the livestock."

Preliminary to a consideration of the effect of this contract provision, let us examine three sections of the Kansas statutes. Section 66-304, G. S. 1935, provides:

"That any common carrier receiving property for the transportation from one point in this state to another point in this state shall issue a receipt or bill of lading therefor and such carrier or any other common carrier to which said property may be delivered or over whose line or lines such property may pass shall be liable to the owner of such property for any loss, damage or injury caused by any one or more of said carriers, and no contract, rule or regulation shall exempt any of such common carriers from the liability hereby imposed: *Provided,* That nothing in this section shall deprive any owner of such property or any holder of such receipt or bill of lading of any remedy or right of action which he has under existing law. That the common carrier which shall pay such loss, damage or injury shall be entitled to recover from the common carrier on whose line or lines the loss, damage or injury shall have been sustained the amount of such loss, damage or injury, as it may be required to pay to the owner of such property, as may be evidenced by any receipt, judgment or transcript thereof."

Section 66-317, G. S. 1935 provides:

"That all persons, firms or corporations operating railroads as common carriers shall transport all livestock received by them for transportation within this state without delay, and shall transport the same at a rate of speed not less than an average of fifteen miles an hour for the entire distance over which said shipment is transported by rail within this state, unless prevented by unavoidable accidents: *Provided,* The time consumed for loading, by stops for watering and feeding occasioned by the requirements of law, or the order of the shipper, shall not be considered a part of the time in which shipments are required to be made."

Section 66-319, G. S. 1935 provides:

"Any provision in a contract of shipment with any railroad company, or express company, or other common carrier, providing in substance as a condition precedent to a recovery for loss or damage for any cause, including delays in transit, that notice in writing be given such railroad company, express company or other common carrier, and which provision fixes the time at which said notice shall be given within a period of less than twenty (20)

days after such claim for loss or damage shall arise, shall be unlawful and void."

It should be noted that the latter section was enacted in 1913 and became effective upon publication of the statute book, April 30, 1913. Our careful search discovers no similar earlier enactment, and counsel have cited none.

Before discussing the cases heretofore decided by this court, it should be made clear that such of those cases as involve interstate shipments are not in point with the instant case for the reason that state laws regulating rail transportation are superseded by federal law insofar as interstate commerce is concerned. In *Mo., Kans. & Tex. Ry. v. Harriman*, 227 U. S. 657, 672, 57 L. Ed. 690, 33 S. Ct. 397, the rule is stated thus:

"The liability sought to be enforced is the 'liability' of an interstate carrier for loss or damage under an interstate contract of shipment declared by the Carmack Amendment of the Hepburn Act of June 29, 1906. The validity of any stipulation in such a contract which involves the construction of the statute, and the validity of a limitation upon the liability thereby imposed is a Federal question to be determined under the general common law, and, as such, is withdrawn from the field of state law or legislation. *Adams Express Co. v. Croninger*, 226 U. S. 491; *Michigan Central Railroad v. Vreeland*, ante, p. 59."

And in *Georgia, Fla. & Ala. Ry. v. Blish Co.*, 241 U. S. 190, 60 L. Ed. 948, 36 S. Ct. 541, it was held that the question as to a proper construction of a shipping contract for an interstate shipment issued under the Carmack amendment is a federal question. Also, see 9 Am. Jur. 917:

"The provisions of the Interstate Commerce Act operate to supersede all all state regulations with respect to notice of loss or injury and claim for damages, in so far as interstate traffic is concerned."

This court has frequently recognized that such state statutes are not applicable to interstate shipments when in conflict with federal statutes. A case very similar to this one now before us was *Kirby v. Missouri-K.-T. Rld. Co.*, 121 Kan. 275, 246 Pac. 1005, and that opinion begins with the statement: "The transportation was interstate, and was governed by federal law." In *Reedy v. Missouri Pac. Rld. Co.*, 123 Kan. 600, 255 Pac. 683, the shipping contract contained a paragraph identical to sec. 4(c) recited above. There the shipment was interstate—from Piqua (Woodson county), Kan., to Kansas City, Mo. In that case the plaintiff relied upon early Kansas cases decided by this court prior to the pertinent federal

legislation, and this court, in reversing the trial court's judgment for plaintiff, said:

"Later federal legislation and rulings of the Interstate Commerce Commission have superseded the rules of law there announced, as applied to interstate shipments. We no longer have the common law action for damages in such shipments." (p. 602.)

To the same effect is *Abell v. Railway Co.*, 100 Kan. 238, 164 Pac. 269, and other cases. Obviously the reason the foregoing cases, although decided subsequent to 1913, do not refer to section 66-319 is because that section had no applicability to interstate shipments.

Also touching upon the distinction between interstate and intrastate shipping contracts, we call attention to *Barber v. Missouri Pac. Rld. Co.*, 118 Kan. 651, 236 Pac. 859, which involved an interstate shipment of grain from Shook, Kan., to Wichita, Kan., and thence on to Galveston, Tex. Plaintiffs there sued under the federal act and claimed that if they could not recover under the federal act, they should be permitted to recover under section 66-304, G. S. 1935. This court in indicating that statute was applicable to intrastate shipments, said:

"The plaintiffs did not sue to recover under this statute. The bill of particulars (the action was commenced before a justice of the peace) was drawn to recover under the federal act governing transportation in interstate and foreign commerce and was not drawn to recover under section 66-304 of the Revised Statutes of this state. The action was tried by the plaintiffs to recover under the federal statute. There is nothing in the record to indicate that the plaintiffs in any way suggested to the court that they might recover under the statutes of this state.

"There was evidence which tended to prove that the plaintiffs put 70,110 pounds of wheat in the car at Shook. The bill of lading states that there were 66,000 pounds of wheat in the car. A record made in the office of the Strong Trading Company at Wichita showed that the bill of lading weight was 66,000 pounds, and that the railroad weight at Wichita was 67,100 pounds, 1,100 pounds more wheat in the car than was indicated by the bill of lading, but 4,110 pounds (68½ bushels) less than what the evidence of the plaintiffs tended to show they put in the car. The contract price was one dollar a bushel. Why should the plaintiffs not recover for the loss of wheat in transportation from Shook to Wichita?

"If the plaintiffs had sued to recover for the loss from Shook to Wichita, their claim would have been $68.50. On a judgment against them on a claim for that amount, they could not have appealed to this court. (R. S. 60-3303.) If the appeal of the plaintiffs is now sustained, it must be on the theory that the evidence to show the loss from Shook to Wichita should have been submitted to the triers of fact. That, if it had been submitted, would have been a claim for $68.50. When the plaintiffs ask to recover the loss from Shook to

Wichita, they in effect abandon their claim for loss from Shook to Galveston and substitute a new action therefor in which the amount in controversy is less than $100." (p. 654.)

Section 66-319, G. S. 1935, since becoming effective on April 30, 1913, has been cited by this court in only one case—and that is *Hylton v. Railway Co.*, 111 Kan. 220, 221-222, 206 Pac. 871. Appellee railroad companies cite and rely upon that case, and except for all lack of reason and authority, it appears to lend weak support to appellees' contention that section 4(c) of their shipper's contract is binding upon appellants as a condition precedent to· their action regardless of and notwithstanding section 66-319. The Hylton case requires strict analysis. It involved an intrastate shipment of cattle from Dunlap, Kan., to Kansas City, Kan., and the shipping contract apparently contained a provision similar to 4(c) of the instant contract. That case was decided May 6, 1922, and the court said:

"Section 8587, General Statutes of 1915, [now 66-319, G. S. 1935] that any provision in a contract of shipment providing as a condition precedent to recovery for damages for any cause, including delays, that notice of such in writing be given in less than twenty days after such claim shall be unlawful and void, is cited. It is therefore insisted that the provision for notice of shipment [claim for damages] in this case was void, and further that the purpose of requiring notice was accomplished in this case, and that none was needed. This same provision was considered in *Hayes v. Railway Co.*, 84 Kan. 1, 113 Pac. 421, and it was held that when cattle are moved from pens at destination without notice being given, the shipper cannot maintain an action for shrinkage and for delay in delivery of the cars at destination chute for unloading. To the same effect are *Ray v. Railway Co.*, 90 Kan. 244, 133 Pac. 847, and *Giles v. Railway Co.*, 92 Kan. 322, 140 Pac. 875. See, also, *Achen v. Railway Co.*, 103 Kan. 668, 175 Pac. 980, involving an interstate· shipment." (L. c. 221-222.)

The Hylton case cites four cases, and two of them were apparently decided by this court since section 66-319 became effective. They are: (1) *Achen v. Railway Co.*, 103 Kan. 668, 175 Pac. 980, an interstate shipment which involved a shipping contract provision not inconsistent with federal statutes, that no action should be maintained against the shipper arising out of the contract of shipment unless brought within six months after the loss. It involved personal injury to a caretaker on the cattle train, and recovery was denied because the action was brought longer than six months after the loss—which, in addition to being an interstate matter, is quite a different question than the one involved here

and obviously not in point with either the instant case or with the Hylton case in which it was cited. And (2) *Giles v. Railway Co.,* 92 Kan. 322, 140 Pac. 875, which makes no mention whatever of section 66-319, although the opinion was filed May 9, 1914. Presumably the damage was quite similar to that in this action, *i. e.,* shrinkage of cattle because of delay in transit. We examined the old briefs filed in the Giles case and according to a statement at page 2 of appellant's brief (found in bound volume 6, Briefs, 92 Kan., No. 18,742) the loss and damage occurred on December 7-8, 1910. That was some 2½ years prior to the effective date of section 66-319. The opinion is based upon the existence of the contract·provision being a condition precedent, and it mentions no statute prohibiting such a provision obviously for the reason that no such statute existed in December, 1910.

The other two cases relied upon in the Hylton case for its apparent holding that section 66-319 was meaningless, are *Hayes v. Railway Co.,* 84 Kan. 1, 113 Pac. 421, and *Ray v. Railway Co.,* 90 Kan. 244, 133 Pac. 847, both of which were decided by this court long before section 66-319 was enacted—and therefore neither of these two cases can possibly be authority for such a holding.

It is true the Hylton case involved an alleged loss or damage sustained some five years after the enactment of section 66-319, and the shipping contract there was similar to section 4(c) which is before us for consideration in the instant case. We can, however, find no reason or logic for the ruling there that section 66-319 is wholly ineffective. As has been pointed out, the four cases cited in support of that ruling actually do not support it to any degree whatsoever. The Hylton case does not suggest that section 66-319 (there cited as G. S. 1935, § 8587) is unconstitutional or void for any reason, and indeed we can conceive of no reason why it is not· a valid statute. The state legislature has power to enact such a law for the regulation of *intrastate* shipments. When legislative enactments are clear and definite and need no judicial interpretation, the courts have no alternative but to follow them. (*American Glycerin Co. v. Freeburne,* 157 Kan. 22, 25, 138 P. 2d 468; *In re Estate of Duel,* 161 Kan. 593, 595, 171 P. 2d 271.)

Section 66-319, G. S. 1935, means exactly what its clear language suggests, and insofar as the decision in *Hylton v. Railway Co.,* supra, is in conflict with that statute, it is overruled. Section 4(c)— recited above—of the uniform shipping contract does not within its

own terms affirmatively state that it is a "condition precedent" to the filing of an action, but this court has held an identical provision to be so. (*Reedy v. Missouri Pac. Rld. Co.*, supra; *Hylton v. Railway Co.*, supra, p. 220.) Being a "condition precedent" to a recovery for such loss or damage, it is unlawful and void as a part of the shipping contract by the language of section 66-319, G. S. 1935.

The judgment of the trial court is reversed with directions to grant a new trial.