No. 40,201

Clayton Nichols and Sherman Lyles, Co-partners, *Appellants*, v. The Atchison, Topeka and Santa Fe Railway Company, a Corporation, *Appellee*.

(299 P. 2d 52)

Opinion filed June 30, 1956.

W. S. *Norris,* of Salina, argued the cause, and *Sanford M. Manker,* and *Eugene H. Linville,* both of Salina, were with him on the briefs for the appellants.

*J. B. Reeves,* of Topeka, argued the cause, and *C. J. Putt, W. E. Treadway,* and *Edwin M. Wheeler,* all of Topeka, were with him on the briefs for the appellee.

The opinion of the court was delivered by

ROBB, J.: This is an appeal from an order of the trial court sustaining a demurrer to the amended petition of appellants.

For convenience we will refer to appellant Clayton Nichols as Nichols, appellant Sherman Lyles as Lyles, and to the appellee as Santa Fe.

The amended petition is quite lengthy but the pertinent allegations thereof, briefly summarized, are:

Nichols and Lyles were co-partners in a sheep business in Ottawa county and Santa Fe is a Kansas railway corporation; Nichols and Lyles purchased 2811 sheep near Menard, Texas, in May, 1951; the fair and reasonable market value of the sheep was $52,640; on May 13, 1951, part of these sheep, which were in good health and free from disease, were consigned to Nichols, acting for the partnership, at Miltonvale, Kansas; the sheep were delivered to and loaded into five cars with 292 sheep to each car by the Gulf, Colorado and Santa Fe Railway Company at Menard; on the same date the remainder of the sheep were likewise delivered, loaded, and consigned to Nichols, acting for the partnership, at Miltonvale; the initial and receiving carrier delivered the ten carloads of sheep to Santa Fe as the delivering carrier; on May 15, 1951, at 4:00 a. m. Santa Fe negligently unloaded and fed the sheep in its stockyards and pens at Emporia, which stockyards were infected with and quarantined by the state livestock sanitary commissioner because they were infected with scabies, a contagious sheep disease; the sheep were thereby exposed and infected with scabies; Nichols and Lyles did not learn of this condition until a time later referred to herein; on May 16, 1951, the sheep were put out to graze on pasture land owned by Nichols and Lyles in Ottawa county.

The amended petition also alleged that on May 14, 1951, Nichols and Lyles purchased 745 sheep at Lampasas, Texas; these sheep likewise were in good health and were free from disease; they cost $12,710, which was their reasonable market value at that time; these

sheep were delivered to and loaded by Santa Fe into four cars owned by the Gulf, Colorado, and Santa Fe Railway Company; the shipment had Nichols and Lyles both as consignors at Lampasas and consignees at Miltonvale; all sheep from Menard and Lampasas were shipped under the terms of a uniform live stock contract entered into on May 13, 1951, but the 745 Lampasas sheep were not reflected therein; the Lampasas sheep were fed and rested at Arkansas City, and after delivery to Nichols and Lyles were commingled and pastured with the Menard sheep which, although still unknown to Nichols and Lyles, were infected with scabies and thus the Lampasas sheep were exposed to and later became infected; on November 2, 1951, Nichols and Lyles, still unaware of the infection with scabies, shipped 700 of the Menard sheep, which weighed sixty pounds each and were of the reasonable market value of thirty-one cents per pound, from Miltonvale to Sioux City, Iowa, by way of the Union Pacific Railroad Company with Rice Brothers commission firm as consignees for sale on November 5, 1951; an Iowa stockyards health inspector found the lambs to be infected with scabies and they were quarantined; this was the first notice Nichols and Lyles had of the infection of their sheep; seventy of the lambs died and the rest were returned to Nichols and Lyles at their expense and to their damage; the returned lambs were not remingled with the others but were later sold at a loss to packing and commission concerns in different towns and on various dates; there remained approximately 2656 sheep which were quarantined, dipped and treated by the Kansas live stock sanitary commissioner but they were not allowed to be moved without written permit; some 561 sheep of the Menard and Lampasas group including some of the 1952 crop of lambs died of starvation when they were rejected by their mothers after they were medicinally dipped and treated for scabies; there was also a loss of wool and since they were not able to move the sheep, Nichols and Lyles had to buy hay, grain and prepared food for them; the quarantine lasted from November 17, 1951, to November 10, 1952, during which time there was a drop in the market value of the sheep; all of these items of damage, which totaled $83,598.98, were alleged to be the direct and proximate result of Santa Fe's negligence at its Emporia stockyards and feeding pens.

Further allegations of Nichols and Lyles' amended petition were that on January 10, 1952, and within nine months from the date

the sheep were delivered to Nichols and Lyles, they sent a letter which they termed a claim to Santa Fe, as follows:

"Longford, Kansas, January 10, 1952

"Mr. B. L. McKinley
    "Asst. General Livestock Agent
        "Kansas City 15, Missouri
"Dear Mr. McKinley:
    "Last spring on May 13th Clayton Nichols and I loaded 10 cars of ewes and lambs at Menard, Texas billed to Miltonvale, Kansas. These sheep were unloaded and fed at Emporia, Kansas. We bought these sheep from Holycamp & Son and without a doubt we bought a clean bunch of sheep. They were inspected at Menard before they were loaded. These sheep were put on a clean pasture for the summer and were never in contact with any other sheep.
    "This fall we sent 700 lambs to Sioux City, Iowa to market and they discovered they had scab and quarantined them and dipped them. The weather was bad there and the lambs got the flu and pneumonia. We lost around 50 head and the result was that they had a sick bunch of lambs that no one would look at and they could not get a bid on them. They called me about it and I told them to send them home. This cost us nearly $2000.00 besides the loss of 100 lambs before they got straightened out. This was just the beginning of our trouble as we are quarantined here and can not sell anything for 6 months. Not being able to move our ewes to winter quarters as we had planned we have lost a good share of our lamb crop. We have lots of expense dipping and death loss and have still another dipping ahead of us this spring.
    "In checking the records as to where these sheep contacted this scab, the state veterinary tells me there were a bunch of scabby sheep fed in the Emporia yards during the month of May at which time our lambs were unloaded and fed there. He also stated that he had found several more similar cases.
    "From the evidence I have I think we are entitled to a claim and I would like very much to hear from you in regards to the matter.
                    "Yours very truly,
                            "/s/  SHERMAN LYLES."

On January 28, 1952, Santa Fe wrote Lyles as follows:

"Dear Sir:
    "This acknowledges your letter January 10th in connection with the shipment of sheep you made last spring from Menard, Texas, to Miltonvale, Kansas, which you say later developed scabs and that you are of the opinion that this scab was contracted in our Emporia Stockyards.
    "As you know it is unlawful to ship scabby sheep out of Texas inter-state and in fact at the present time or in the very near future, it is my understanding that all sheep coming out of Texas unless intended for immediate slaughter will have to be dipped. It is common knowledge that there is more or less sheep scab in that state and particularly in the vicinity of Brownwood and Menard. There were some sheep in our Emporia Stockyards that the inspectors found had scabs and they had to be brought into the Morris and dipped and we had to clean and disinfect the pens and alley through which they moved at Emporia.

"I personally went to Emporia last week and looked into this and find that your sheep were not in any of the pens that had contained these scabby sheep, neither were they moved through or over any premises where the scabby sheep had moved and of course we were not responsible in the first place for our pens becoming exposed to scabs.

"I indeed regret the experience you had which I know has proved very costly but it may be, Mr. Lyles, that these sheep had the scab germ on them before they left Menard because as stated, scab was prevalent in that vicinity and in fact the sheep that were quarantined at Emporia came from Brownwood.

"I find we adjusted a small claim on this same shipment for some deads sending our voucher for $142.75 to Clayton Nichols at Longford, Kansas, the forepart of August last year.

"I have no alternatives except to advise you that we would be compelled to disallow any claim that might be filed on the particular sheep mentioned in your letter on January 10th.

"With best personal regards, I am

"Yours truly,
"/s/  B. L. McKinley."

The trial court sustained the demurrer of Santa Fe, dismissed the amended petition of Nichols and Lyles and in its journal entry stated:

"WHEREUPON, the Court . . . finds that it does not appear from plaintiffs' amended petition that claim was made in accordance with the provisions of law and the Uniform Live Stock Contract, and that for that reason *only* the amended petition . . . fails to state a cause of action . . ." (Our emphasis.)

Nichols and Lyles appealed from that ruling.

The pertinent portions of the uniform live stock contract are:

"As a condition precedent to recovery, claims must be filed in writing with the receiving or delivering carrier, or carrier issuing this bill of lading, or carrier on whose line the loss, damage, injury or delay occurred, within nine months after delivery of the property. . . . Where claims are not filed or suits are not instituted thereon in accordance with the foregoing provisions, no carrier hereunder shall be liable, and such claims will not be paid." (Section 2 [c].)

"Before the live stock is removed from the possession of the carrier or mingled with other live stock the shipper, owner, consignee or agent thereof shall inform in writing the delivering carrier of any visible or manifest injury to the live stock." (Section 4 [c].)

Our attention is first directed to the proposition as to whether the trial court erred in deciding that the letter of Nichols and Lyles dated January 10, 1952, did not make it appear that a claim was being made in accordance with the provisions of the uniform live stock contract and the laws applicable thereto.

Santa Fe admits that under section 2 (c) Nichols and Lyles had until February 17, 1952, to file a claim so that if the letter of January 10, 1952, fulfilled the requirements of a claim under the bill of lading contract, it was within time. Without going into and reiterating the numerous cases in our decisions regarding the sufficiency of pleadings attacked by demurrer, we will proceed directly to the proposition of the sufficiency of the letter of Nichols and Lyles to establish a claim in consideration of the facts and circumstances involved in this case under the bill of lading, the live stock shipping contract, and the law applicable thereto.

It is further admitted by the parties, and correctly so, that the federal law applies in the case here under consideration because an interstate shipment is involved. (*Mangelsdorf Seed Co. v. Missouri Pac. Rld. Co.*, 128 Kan. 729, 280 Pac. 896; *Anderson Cattle Co. v. Atchison, T. & S. F. Rly. Co.*, 167 Kan. 306, 206 P. 2d 124.)

Santa Fe claims that section 4 (c), as above quoted, is controlling on the time for filing claim but we do not agree. The amended petition did not show on its face that the injury was visible or manifest but rather that the disease of scabies was unknown to Nichols and Lyles until the incident in the Iowa stockyards. It is true that there was a need for Santa Fe to have prompt information as an aid to inquiry and a preventive of fraud coupled with claimants' opportunity to obtain such knowledge. (1 Merrill on Notice, § 533, p. 542.) Although such contractual requirements in a bill of lading are for the purpose of putting into permanent form the evidence of an intention to claim damages and to give the utility the opportunity to investigate the claim while such inquiry may be of value, the better view seems to be that such requirements should be construed reasonably with a view to effectuate their purpose rather than being construed strongly against the utility as has been done in some cases. (1 Merrill on Notice, § 536, p. 554.)

Section 4 (c) applies to injuries that are visible or manifest such as dead animals, or animals which are crippled or scarred (*Kirby v. Missouri-K.-T. Rld. Co.*, 121 Kan. 275, 277, 246 Pac. 1005) but in this case we do not have such a visible or manifest type of injury involved and such provision does not apply to injuries which cannot be ascertained before removal. (2 Merrill on Notice, § 738, p. 148, § 813, p. 318.)

Santa Fe stresses the case of *Reedy v. Missouri Pac. Rld. Co.*, 123

Kan. 600, 255 Pac. 683, but the facts of that case which invoked the application of section 4 (c) were that damages claimed there involved dead hogs, bad appearance of the animals, shrinkage, and decline in market. The jury allowed nothing for the decline in market element of damages and based recovery solely on visible or manifest injury. This court, in holding that strict compliance with 4 (c) was a condition precedent to any recovery by claimant, had this to say,

"If damages are sought for decline in market, notice to the delivering carrier, before live stock is removed from the possession of the carrier and delivered with other stock, is not necessary." (p. 602.)

See, also, 9 Am. Jur., Carriers, § 800; 13 C. J. S., Carriers, § 240 (b), p. 488.

The result is we believe that 4 (c) is not controlling here and we therefore pass on to the stipulation set out in 2 (c) which we think is controlling. All that has been said heretofore likewise applies to 2 (c) the same as it does to 4 (c) and especially is this true as to the reasonable contruction to be given in order to effectuate the purpose of the provision. (St. Louis, I. Mt. & So. Ry. Co. v. Starbird, 243 U. S. 592, 604, 37 S. Ct. 462, 61 L. ed. 917, 925.) The only serious question raised regarding section 2 (c) is whether Nichols and Lyles' letter was sufficient to constitute a claim. In the above mentioned case at page 605 the Supreme Court of the United States said that a telegram was sufficient notice of claim, as had been shown by one of its previous decisions involving a shipment of livestock, and that Court further said in the Starbird case, which involved a shipment of peaches, that the consignee knew of the loss in time to comply with the reasonable stipulation in the bill of lading, which conformed with federal law, and that even though he could not determine the amount of his damages until after the expiration time, as a condition precedent he was still required to make the claim of loss in writing within the time limit. (pp. 604, 605.) There was no attempt in the Starbird case to make, or file, any claim so that the carrier was given no opportunity to make an examination, which was the principal purpose of the stipulation.

The case of Georgia, Fla. & Ala. Ry. v. Blish Co., 241 U. S. 190, 197, 198, 36 S. Ct. 541, 543, 60 L. ed. 948, 953, which was cited by both parties, involved a shipment of flour for which a claim made in the form of telegrams was held to be a valid one because

in considering all the telegrams together, the shipment had been adequately identified, the particular shipment to which the claim referred had been established beyond question and was, in substance, the making of a claim within the meaning of the stipulation —the object of which was to secure reasonable notice. (p. 198.) Such a stipulation does not require documents in a particular form. It is addressed to a practical exigency; it is to be construed in a practical way.

No particular formality or technical exactness was required but only substantial compliance with the stipulation in order to constitute a valid claim in the case under consideration, and the letter of January 10, 1952, was certainly a sufficient writing which did just that. (13 C. J. S., Carriers, § 239; 9 Am. Jur., Carriers, § 801.) Many additional authorities are cited by the parties but due to distinguishing facts and circumstances and in order to avoid needless repetition of the same rules, we will not analyze all of them herein.

Santa Fe raised the additional point that if this was a claim, it was not served on the proper representative. As was so aptly stated at the time of argument when considering the question as to which employee of the corporation was the proper one upon whom to serve the claim in writing, the Santa Fe's assistant general livestock agent was "no understrapper." The Santa Fe perceives and acts only through its agents and representatives and knowledge on the part of such agent, or representative, especially in and affecting the very department of which he is a part, is knowledge chargeable to Santa Fe. (3 Merrill on Notice, § 1220, p. 150.) Here there was no requirement in the stipulation as to the proper agent upon whom such claims had to be filed as was true in the case of *Southern Pac. Co. v. Stewart*, 248 U. S. 446, 447, 39 S. Ct. 139, 63 L. ed. 350, where the stipulation required the claim to be filed on the *freight claim agent*.

There are other matters raised in the record but in view of what we have said it is not necessary to discuss and determine them. The trial court erred in sustaining the demurrer and in dismissing the action of Nichols and Lyles on the ground stated.

The judgment is reversed with directions to overrule the demurrer.